Robert C. BIANCHI, Plaintiff,

v.

CITY OF PHILADELPHIA,
et al., Defendants.

No. 99–CV–2409.

United States District Court,
E.D. Pennsylvania.

Jan. 7, 2002.

Andrew F. Erba, Williams & Cuker, Philadelphia, PA, Nancy Abrams, Spector, Gadon & Kosen, PC, Philadelphia, PA, for plaintiff.

Michael Holmes, Micton Velez, City of Philadelphia Law Dept., Philadelphia, PA, for defendants.

### *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

Plaintiff Robert Bianchi ("Bianchi" or "plaintiff") has filed suit against his former employer, the City of Philadelphia and the Philadelphia Fire Department ("City" or "defendant"), asserting multiple claims under 42 U.S.C. § 1983 (Title VII), the Pennsylvania Human Relations Act (PHRA), 43 P.S. §§ 951, et seq., the United States Constitution, and Pennsylvania common law. These claims all stem from a series of events occurring between March 1996 and November 1999 (after the commencement of this lawsuit). During this period, plaintiff claims he was sexually harassed by his co-workers and subsequently dismissed from his position in the fire department in retaliation for reporting the harassment. He also claims the defendants denied his right to procedural due process, to free speech, and to petition the courts, and that the defendant intentionally inflicted emotional distress upon him. Plaintiff filed his original complaint on May 11, 1999 and filed an amended complaint on October 19, 1999. Bianchi seeks declaratory and injunctive relief (a return to his job) as well as compensatory and punitive damages. On June 22, 2001, the defendants moved for summary judgment on all counts.

### *FACTUAL BACKGROUND*

When considering the defendant's motion for summary judgment, the facts will be interpreted in the light most favorable to the plaintiff, the non-moving party. Plaintiff, Robert Bianchi joined the Philadelphia Fire Department in 1977. After seventeen years of service, he was promoted in 1994 to the rank of lieutenant. Immediately after his promotion, Bianchi worked as a "floater" in the system, that is he was not assigned to any particular fire station. After floating for a period of time, Bianchi began in a position at Fire Department Headquarters in the Technical Support Unit. On March 11, 1996, Bianchi was assigned to Ladder Company No. 2, Platoon A, located at the firehouse at 4th and Arch Streets. (Deposition of Bianchi, 16–18). Approximately six weeks after assuming command of the platoon, Bianchi began to institute changes in the discipline and training at the firehouse, some of which were not well received by members of the company. (Investigation Interview Record, Lt. Steven Nolan interviewing Bianci, 3).

In April 1996, the alleged sexual harassment began. Bianchi claims he discovered several used condoms that had been placed inside his desk drawer and began finding explicit homosexual playing cards, inside his desk, his uniform, and his running

gear. Other materials were placed in his desk drawer including advertisements for homosexual magazines. Additionally, Bianchi received a postcard at the firehouse insinuating that he was homosexual and found envelopes with the return address from the Gay Firefighter's Association in his desk. The harassers also allegedly placed either urine or feces on the sleeve of Bianchi's running gear, that he claims caused a fungal infection around his mouth. (Investigation Interview Record, Lt. Steven Nolan interviewing Bianchi, 4–7).

Though initially reticent, as these incidents continued Bianchi brought them to the attention of his supervisors. (Deposition of Bianchi, 37–43). At that point, no official action was taken, although more senior members of the department spoke to Bianchi's platoon, advising them that this conduct would not be tolerated. (Deposition of Bianchi, 43). Following the incident concerning Bianchi's running gear, plaintiff became more vociferous in his complaints and increasingly confrontational with other members of the fire department. On November 29, 1997, Bianchi informed Battalion Chief Robert Drennen that because matters were not being handled to his satisfaction by the department that he intended to take his complaints outside of the fire department and bring them to the attention of the police, the civil service commission, and his union. (Memorandum from Bianchi to Robert Drennen,

November 29, 1997). Subsequently, during the month of December 1997, Bianchi was removed from the firehouse at 4th and Arch and was placed in a position with the Safety Office of the department. (Investigation Interview Record, Lt. Steve Nolan interviewing Bianchi, 7).

On January 20, 1998 a meeting was held and attended by Bianchi, the president of his union, an attorney representing Bianchi (hired by the union), and the battalion chief and special investigations officer, William Schweizer. (Deposition of Bianchi, 63–64). At that meeting the City notified Bianchi that he was removed from firefighting line duties and would be subject to physical and mental exams before he could be returned to full work. Additionally, Bianchi claims he was threatened by members of the fire department during this time. However, he returned to work on March 5, 1998 (Pl.'s Complaint, Par. 21–22). Upon his return, Bianchi claims members of the fire department once again threatened him; this time a captain encouraged him to remain in his administrative position so he would continue to be "safe," and an anonymous phone caller who stated that Bianchi's twin brother (also a member of the fire department) was in danger (Deposition of Bianchi, 86–90).

On April 7, 1998, Bianchi received a threatening letter smeared with feces at his home.[1] Bianchi promptly reported this

---

1. The letter stated:

 BOB,

 HERE IS SOME SHIT FOR YOU ASSHOLE. WE HEAR YOU ARE BACK TO WORK IN A PUSSY JOB YOU WILL NOT BECOMING TO YOUR REGULAR JOB ANYMORE, WE WILL SEE TO THAT DON'T GET TO COMPORTABLE BECAUSE WE WILL NOT BE HAPPUY UNTIL WE GET YOU OUT FOR GOOD!!!! YOU AND YOUR BROTHER ARE TWO QUEERS LIVING TOGETHER WE PREFER WOMAN. YOUR BROTHER IS NEXT. SO TELL ME WHAT IT IS LIKE TO JERK OFF TOGETHER. YOU DO NOT HAVE ONE FRIEND IN THE DEPARTMENT AND YOU ARE NOT SHIT!!! YOU AND YOUR

 BROTHER WILL BE GONE SOON. DONT DRIVE AROUND TO MUCH AND DONT THINK YOU WILL BECOMING BACK!!!!

 Plaintiff's pleadings show some confusion with regard to the date of this letter. In the complaint, the depositions attached to the pleadings, and in the defendant's pleadings, the date is given as 1998. However, in the plaintiff's response to the summary judgment motion, the letter is placed in 1997. Because in the majority of pleadings and considering the chronology of events in the light most

incident to the department and turned the letter over to Battalion Chief Schweizer. (Deposition of Bianchi, 46). At this point, an investigation into the incidents was launched and the fire department enlisted the aid of the police. A report issued on June 8, 1998, sustaining Bianchi's accusations of harassment and finding that the firehouse constituted a hostile work environment for him, but the investigation failed to identify the individuals responsible for the incidents. (Investigation Report of Mark Jones, June 8, 1998). The following month, in July 1998, Bianchi took a medical leave on the advice of his doctor. (Deposition of Bianchi, 95–97).

On October 2, 1998, Bianchi's own psychologist cleared him to return to work. (Deposition of Bianchi, 98). Dr. Hayes, the City's doctor, then told Bianchi that based on the report of the contract psychiatrist, Dr. Arce, he could return to work. However, he did not return to active duty and Dr. Hayes changed his position after a conversation with Bianchi's superiors in the fire department. (Deposition of Bianchi, 138–39) (Deposition of George Hayes, M.D., 19). Bianchi claims he was promised a meeting with the Fire Commissioner and his own doctor, after which he would be reinstated. Such a meeting was never scheduled and as a result Bianchi did not return to work at any point. (Deposition of Bianchi, 135–137).[2]

In March 1999, the fire department's human resources manager sent a letter to Bianchi informing him that his sick leave would expire in June and advised him of the procedures to avoid dismissal if he needed more time away from work. (Letter dated March 9, 1999, from Ronald Augustyn to Bianchi). In May 1999, plaintiff filed suit in this court. Subsequent to the initiation of this action, on November 4, 1999, the fire department sent another letter to Bianchi, advising him that all of his accumulated leave was about to expire. Under the Civil Service Regulations of the department, unless Bianchi requested a leave of absence without pay, he would be separated from the department. (Letter dated November 4, 1999 from Ronald Augustyn to Bianchi). Plaintiff took no such action and was deemed to have abandoned his position.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The role of the trial court is to determine whether there are issues with regard to material facts that warrant a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making its determination, the court must consider the underlying facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that might be drawn from those facts. See Matsushita Elec. Indus.

favorable to the plaintiff, for purposes of this motion, the letter was written in 1998.

**2.** Bianchi obtained an injunctive order in the Philadelphia Court of Common Pleas, requiring the fire department to allow him to return to work in February 1999, but the defendants refused to reinstate him. (Deposition of Bianchi, 108). Defendants contend that this decision was ultimately overturned by the Pennsylvania Commonwealth Court on December 4, 2000. (D's Motion for Summary Judgment, 23). While no independent verification of these decisions has been submitted, plaintiff does not dispute that the decision to issue the injunction was reversed.

*Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sempier v. Johnson and Higgins,* 45 F.3d 724, 727 (3d Cir.1995) (en banc). Summary judgment is appropriate if the court finds that the record "could not lead a rational trier of fact to find for the non-moving party, [and] there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

### DISCUSSION

■■■ The plaintiff's amended complaint includes eight counts against defendants the City of Philadelphia and the Philadelphia Fire Department.[3] Because plaintiff's first two allegations, alleging substantive violations of Title VII and the PHRA, encompass identical legal standards, I have considered them together, just as I have with Counts III and IV of the amended complaint, alleging retaliation under those same provisions.[4] Otherwise, I will consider summary judgment with regard to each count individually.[5]

### Counts I and II: Title VII and PHRA Sexual Harassment

■■■ Title VII makes it "an unlawful employment practice ... to discriminate against any individual ... because of sex."

42 U.S.C. § 2000e–2(a)(1) (2000). To prevail on a hostile work environment claim, a plaintiff must demonstrate five elements. An employee must show (1) he or she suffered discrimination because of sex; (2) this discrimination was "pervasive and regular;" (3) some negative impact resulted from the discrimination; (4) the conduct would effect a reasonable person in a similar position; and (5) the employer's respondeat superior liability. Together these elements establish a case of sexual discrimination. *Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 293 (3d Cir.1999) (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990)).

■■■ Same-sex harassment is barred by Title VII. *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (Title VII protections include "sexual harassment of any kind that meets the statutory requirements"). Recently, in *Bibby v. Philadelphia Coca Cola Bottling Company,* 260 F.3d 257 (3d Cir.2001), the Third Circuit articulated three ways in which a plaintiff may prove same-sex harassment. A plaintiff may prove same sex sexual harassment by (1) demonstrating a scenario in which the harassment is motivated by the ag-

---

**3.** The headings in the amended complaint only list Counts I through VII. However, there are two distinct counts both labeled Count V. I have assumed this is an error and have, for purposes of this motion assigned new designations to the two Counts V. The first Count V is now Count V–A (due process) and the second Count V (free speech) is now Count V–B.

**4.** Pennsylvania courts look to the federal courts' interpretation of Title VII and other civil rights legislation in interpreting the Pennsylvania Human Relations Act. *See Kryeski v. Schott Glass Technologies, Inc.,* 426 Pa.Super. 105, 626 A.2d 595 (1993). Federal courts also treat these pieces of legislation as embodying identical standards. *See Latch v. Southeastern Pennsylvania Transp. Authority,*

984 F.Supp. 317, 319 (*citing Kelly v. Drexel University,* 94 F.3d 102, 105 (3d Cir.1996)).

**5.** As a preliminary matter, Philadelphia Fire Department argues that it should be dismissed from the case because it cannot be sued as a distinct entity from the City of Philadelphia. Plaintiff does not contest this and the law is clear. Municipal agencies of the City do not have a separate corporate existence and "all suits growing out of their transactions ... shall be in the name of the City of Philadelphia." 53 P.S. § 16257. Because the Philadelphia Fire Department cannot be named as a defendant, Bianchi's sole recourse is against the City of Philadelphia. Therefore, all counts as they apply to the fire department will be dismissed.

gressor's sexual desire; (2) showing that a harasser displays hostility towards the participation of a particular sex in the workplace or performing a particular function; or (3) illustrating that the "harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender." *Id.* at 262–63.

Bianchi may only claim the protections of Title VII if he can demonstrate he was discriminated against because of sex. The City of Philadelphia asserts that it is entitled to summary judgment because Bianchi has failed to demonstrate that he suffered workplace discrimination because of his sex and therefore cannot establish a violation of the statute. Because Bianchi has not met his burden in demonstrating he suffered discrimination because of his gender, the defendant is entitled to summary judgment on Counts I and II of the amended complaint.

When considering the facts of this case in the light most favorable to the plaintiff, Bianchi does not fall into any of the three categories enumerated in *Bibby*. Nowhere does the plaintiff contend that the actions of his co-workers were motivated by any sort of sexual desire. While "when a gay or lesbian supervisor treats a same-sex subordinate in a way that is sexually charged, it is reasonable to infer that the harasser acts as he or she does because of the victim's sex." *Bibby*, 260 F.3d at 262, Bianchi's allegations clearly do not fit this scenario. Nor does Bianchi make the claim that the harassment he suffered fits within the second type of same-sex harassment described by the Third Circuit, where the illegal conduct results from discontent with a member of a particular gender filling a particular role in the workplace. Bianchi does not assert that his harassers were unhappy with the presence of a male fire lieutenant at Ladder 2.

Therefore, in order to satisfy his burden at the summary judgment stage Bianchi must demonstrate that his claim fits into the third category described in *Bibby* and that he was discriminated against because he failed to conform to a gender stereotype. The Supreme Court described this version of sexual harassment in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In *Price Waterhouse,* the plaintiff, a woman, had been denied partnership, in part because she was deemed to be too aggressive. In order to improve her chances in the future, her male supervisors advised her to lose her "macho" and "masculine" demeanor and instead to "walk more femininely, talk more femininely, dress more femininely, wear makeup, have her hair styled, and wear jewelry." *Id.* at 250, 109 S.Ct. 1775. The Court found that this conduct was in violation of Title VII and more generally that disparate treatment stemming from the use of gender stereotypes in the employment context was illegal. *Id.* at 251, 109 S.Ct. 1775.

Since the Supreme Court's decision, other circuits have analyzed same-sex, hostile environment claims under a *Price Waterhouse* standard. In *Doe v. City of Belleville,* 119 F.3d 563 (7th Cir.1997), *vacated by* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313, the Seventh Circuit found that harassment of a teenage boy by male co-workers, motivated by their belief that because he wore an earring he was not sufficiently masculine, was discrimination because of sex in violation of Title VII. *Id.* at 568. While the case was later vacated for reconsideration in light of *Oncale,* the analysis of the "because of sex" issue remains good law and is consistent with subsequent jurisprudence.

In the supplemental brief, the plaintiff likens his claim to a successful plaintiff in a recent decision by the Ninth Circuit. In

*Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir.2001), the plaintiff claimed he was sexually harassed because he was "effeminate" and failed to conform to the male stereotype. Male co-workers regularly used female pronouns, describing the plaintiff as "she" and "her." While sometimes these same co-workers alluded to plaintiff's sexuality and called him "faggot," they also referred to him as a "female whore." *Id.* at 869–70. Because these terms clearly indicated that the harassers discriminated against the plaintiff because he "acted too feminine," the abuse was closely linked to gender and satisfied the "because of sex" requirement of Title VII. *Id.* at 874.

In this case, Bianchi has not met his burden by raising the inference that he suffered discrimination "because of sex." Based on the complaint itself, a reasonable finder of fact could infer several possible motivations for the conduct of the harassers, including that: (1) the harassers had some information that Bianchi had either engaged in homosexual conduct or made homosexual advances, leading them to believe he actually was a homosexual; (2) the homosexual insults had nothing to do with any belief about Bianchi's sexuality and instead were a manifestation of general discontent with his conduct at the fire station; (3) the conduct was a form of "horse play"regularly engaged in by firefighters; or (4) Bianchi possessed certain characteristics or traits that deviated from the "manly" stereotype and caused his harassers to torment him. While the first three fail to show harassment "because of sex," the last satisfies that requirement and would provide the grounds for relief under Title VII.[6] In the motion for summary judgment, the defendant adopts the first of these views, taken largely from Bianchi's own claims and deposition statements, admitting that he believed his tormentors believed (mistakenly) that he was a homosexual.[7] (Deposition of Bianchi, 62, 109).

After the defendant has advanced its theory and provided support for it, in order to survive summary judgment, plaintiff must come forward with enough evidence to raise the inference that his harassers targeted him because he failed to conform with their ideal of masculinity. At best it seems to me, although never explicitly articulated by the plaintiff in his supplemental memorandum, plaintiff asks me to make a series inferences in order to find that he is entitled to the protections of Title VII. This argument begins with the undisputed fact that he was called homosexual by his co-workers and taunted for allegedly being a homosexual. Implicit in those allegations, plaintiff could argue, is the fact that there was something unmanly about him which his harassers seized upon and used to cause his torment.[8] There-

---

**6.** Because the plaintiff's complaint raised this as one possible inference, it would have survived a motion to dismiss for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). However, to survive a motion for summary judgment, the plaintiff faces a higher burden and must come forward with evidence to counter the assertions of the moving party that amounts to more than a "mere scintilla" of evidence to counter the moving party's claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**7.** Evidence in the record also supports the "horseplay" theory. After conducting an investigation of the events and interviewing other members of the department, Inspector Mark Jones noted that other, similar incidents had occurred and that the men regarded it as "harmless clowning." (Investigation Report of Mark Jones, June 8, 1998).

**8.** In the supplemental memorandum, plaintiff correctly identifies the "offensive stereotype" argument. However, he continues to adhere to the notion that the offensive stereotype

fore, his claim falls within the *Price Waterhouse* and *Nichols* line of cases.

These links that Bianchi could draw between accusations of his homosexuality and some inherent unmanliness is too attenuated to meet his burden on summary judgment. In *Price Waterhouse, City of Belleville*, and *Nichols* the gender stereotyping was more explicit. In those cases there were direct comments made concerning the plaintiff's gender, rather than the plaintiff's sexuality. Here the only evidence that might directly link the harassment of Bianchi to a gender stereotype is the reference in the April 1998 letter to Bianchi's new position in the fire department as a "pussy job." A "pussy job" is easily understood as "a job for a woman," and implicates his masculinity. In conjunction with the general nature of the harassment, Bianchi might have made an argument that because he failed to conform to the manly stereotype and was regarded in some way as effeminate, his co-workers targeted him and harassed him "because of sex." Plaintiff, however, has not endorsed this theory of the case, and absent that support, I cannot find that plaintiff has demonstrated he suffered discrimination "because of sex."

Though in a supplemental memorandum submitted after the *Nichols* decision, the plaintiff argues that the harassers actions were based on an "offensive stereotype," Bianchi does not point to any specific characteristic, trait, or behavior which would indicate he was somehow unmanly or perceived to be so. Unlike the plaintiffs in *Price Waterhouse, Nichols,* and *City of*

*Belleville,* Bianchi does not cite to any particular comments, actions, or other evidence in the record supporting his vague contention that the root of the harassment was that he acted (or was perceived to have acted) inappropriately for a male. Plaintiff fails to point to anything referring to gender stereotypes and his failure to live up to them. Though he recognizes the availability of the "offensive stereotype" claim, he foregoes his opportunity to actually make it to the court and as a result cannot survive summary judgment.

■ Before it can be deemed that the plaintiff has met his burden to survive summary judgment, he must present some evidence that the discrimination he suffered resulted from his failure to match the societal ideal of manliness. In denying a similar claim, the Second Circuit noted, "[w]e do not have sufficient allegations before us to decide [plaintiff's] claims based on stereotyping because we have no basis in the record to surmise that [plaintiff] behaved in a stereotypically feminine manner and that the harassment he endured was, in fact, based on his non-conformity with gender norms instead of his sexual orientation." *Simonton v. Runyon,* 232 F.3d 33, 38 (2d Cir.2000). Not only has Bianchi failed to present evidence indicating he deviated from an ideal of manliness, he explicitly states his belief that the harassment was rooted in other causes. In his complaint and deposition, Bianchi stated that the harassment was based on the mistaken belief that he was a homosexual. (Amended Complaint, Par. 19, Deposition of Bianchi, 62, 109).[9] His unwaver-

related to homosexuality, rather than a deviation from gender expectations.

**9.** Though plaintiff contests the defendant's assertion that he had difficulty getting along with his co-workers and responded inappropriately in particular situations, he does acknowledge there was some resistance in the

station house to his methods of leadership and discipline. (Deposition of Bianchi, 24–25). This is another potential source of the harassment directed against Bianchi, and an equally insufficient one to prevail on a Title VII claim. The statute does not provide a remedy for harassment when the animosity stems from workplace politics. *See Brown v.*

ing persistence in presenting his complaint as one concerning his alleged sexuality, rather than one concerning his alleged failure to meet a masculine ideal, defeats his Title VII harassment claim.

■■■■ Despite the limitations imposed by *Bibby*, Bianchi offers an alternative theory to demonstrate the he suffered discrimination because of sex. He asserts that because the content of the harassing materials was somehow sexual, it is possible to infer that the discrimination he suffered is "because of sex." This, however, misconstrues the primary purpose of the law and goes beyond the parameters imposed by the Third Circuit. In Title VII cases, "the critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Though the materials and means of harassment contain sexual content and connotations, that does not automatically mean that the motivation for such harassment satisfies the "because of sex" requirement of the statute. *See Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998 (plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex' "). "The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit.... A more fact intensive analysis will be necessary where the actions are not sexual by their very nature." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482, n. 3 (3d Cir.1990) (discussing

*Henderson*, 257 F.3d 246, 255 (2d Cir.2001) (noting that cruel and vulgar behavior rooted in rivalry attributable to union election does not fall within the protections of Title VII).

the requirements for a hostile environment claim and what it means to be "because of sex"). The actions allegedly taken against Bianchi undoubtedly constitute harassment, but simply because the harassers used materials of a sexual nature, does not mean that Title VII bars the harassment. The *Bibby* decision makes it clear that only three means of showing same-sex harassment exist, and this is not one of them.

Because Bianchi, as a matter of law, cannot demonstrate that he was discriminated against because of his sex, he has not met his burden to survive summary judgment with regards to Counts I and II of the amended complaint. Even if plaintiff proved all of the allegations contained in the pleadings, he would still not present a claim that brings him within the auspices of Title VII. For this reason, I will grant the City of Philadelphia's motion for summary judgment on these counts.[10]

### Counts III and IV: Anti-retaliation Provisions of Title VII and the PHRA

■■■■ In addition to prohibiting discrimination based on gender, Title VII and the PHRA bar retaliation by an employer against an employee who has participated either as a complainant or witness in an action brought to enforce that legislation. An employer may not "discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (2000). Bianchi claims that his removal from active line duty, his placement in an administrative position, the department's refusal to reinstate him, and his eventual

10. Because the plaintiff does not satisfy the first prong of the hostile environment claim, I will not examine whether he meets the remaining four requirements.

separation were in retaliation for pursuing his harassment claim.

 In order to establish his claim of discriminatory retaliation, Bianchi must demonstrate three elements: (1) that he engaged in conduct protected by Title VII; (2) that his employer subsequent to this conduct took adverse employment action against him; and (3) that there was a causal connection between the conduct protected by the statute and the employer's actions. *See Nelson v. Upsala College,* 51 F.3d 383, 386 (3d Cir.1995) (citations omitted). Courts have found action short of filing a lawsuit to be protected activity. Bringing an EEOC claim as well as writing an informal letter complaining specifically of discriminatory conduct can be sufficient. *See Barber v. CSX Distribution Services,* 68 F.3d 694, 701–02 (3d Cir. 1995). An employee does not need to demonstrate that the action he protests is actually a violation of Title VII, instead he need only to have a good faith belief that his behavior is protected conduct. *See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1085 (3d Cir.1996). Moreover, in order to prevail on a retaliation claim, a plaintiff "need not prove the merits of the underlying discrimination complaint." *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 468 (3d Cir.1993). A verdict, therefore, can contain both a finding against a plaintiff on his Title VII discrimination claim, but for a plaintiff on his Title VII retaliation claim. *See, e.g., Woodson v. Scott Paper Co.,* 109 F.3d 913 (3d Cir.1997); *Riseman v. Advanta Corp.,* 2001 WL 1175126, No. 98–CV–6671, *1 (E.D.Pa. September 12, 2001).

It is undisputed that Bianchi made the required complaints.[11] The defendant ar-

gues that Bianchi did not engage in a protected activity because his substantive Title VII complaint is not covered by the statute and therefore he cannot possibly establish the first element of a retaliation claim. This assertion is erroneous as a matter of law. The complaints made by Bianchi fall within the protections of Title VII. As long as Bianchi has raised a reasonable inference that he possessed the requisite good faith belief that he was protesting conduct outlawed by Title VII, he has met his burden to survive summary judgment on this ground. The record contains sufficient evidence to sustain a finding of Bianchi's good faith belief that he had a legitimate claim for discrimination under Title VII. From a legally knowledgeable point of view, the *Bibby* decision, issued in August 2001 and long after the events in question, was the first definitive statement of law in the Third Circuit concerning the protection from sexual orientation discrimination through Title VII. *See Bibby,* 260 F.3d at 257. From a layman's point of view, the plaintiff's belief is also reasonable. Bianchi knew what was being done to him was not right; he knew it constituted harassment; he knew it was sexual in nature. His lack of knowledge concerning the precise parameters of Title VII does not remove his claims from the realm of good faith. While ultimately the question of "protected activity" will be decided by the finder of fact, Bianchi has met the necessary burden to survive summary judgment with regard to this element of his retaliation claim.

 It is somewhat unclear whether or not the defendants argue that Bianchi has failed to satisfy the second element, that the employer took adverse employment ac-

11. Bianchi complained bitterly about his treatment to his superiors (Memorandum dated November 29, 1997 from Bianchi to Fire Commissioner Hairston), to his union (Deposition of Bianchi, 59), to the courts (Deposition of Bianchi, 108), and to the EEOC (EEOC Notice of Charge of Discrimination, September 2, 1998).

tion against him. It is possible to infer this argument from the City's insistence that Bianchi's leaves, transfers, and eventual separation were voluntary. However, the parties vigorously dispute the course of events as well as the "voluntary" nature of these alterations. When considering the facts in the light most favorable to the plaintiff, Bianchi has satisfied his burden to survive summary judgment as he has raised a reasonable inference that adverse actions were taken against him. These actions include moving Bianchi from the 4th and Arch station to the safety office, failing to reinstate him after he had allegedly been medically cleared, and refusing to comply with the court's injunctive order.

 As an alternate theory, the defendant focuses on the third element of the retaliation case and asserts that the Bianchi cannot demonstrate the necessary causal and determinative connection between his claims and the adverse employment action. Analyzing the relationship between the pursuit of the harassment claim and adverse employment action in a retaliatory discharge claim involves three steps: (1) the plaintiff must provide enough evidence to raise the inference that the defendant retaliated against him; (2) the defendant can show a legitimate non-discriminatory reason for their actions; and (3) the plaintiff can show the defendant's reason is a mere pretext for their firing. *See Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir.1986). The City asserts that based on the undisputed material facts of the case, no reasonable jury could conclude that a causal link existed between Bianchi's complaints about harassment and his severance with the fire department.

 Bianchi has proffered enough evidence to raise the inference of retaliation. He has established that particular events of a harassing nature occurred and that he complained bitterly about those events both within and outside of the fire department. *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989) (finding that plaintiff "unquestionably engaged in protected activity when he filed discrimination claims with ... the EEOC"). He has also shown that following those complaints he was transferred to a different job. The defendant, in turn, has offered a legitimate, nondiscriminatory motive for any adverse employment consequences that the plaintiff suffered. The City claims the adverse employment consequences suffered by plaintiff resulted from his own mental instability, his conflicts with co-workers, and the failure to comply with departmental procedures for reinstatement. To survive summary judgment, then Bianchi must offer enough evidence to permit a reasonable factfinder to either infer that the legitimate reason offered by the employer is untrue, or determine that an "invidious discriminatory reason was more likely that not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764–65 (3d Cir.1994).

 A plaintiff may demonstrate the causal link between the protected activity and the adverse employment action by showing the "temporal proximity" between the protected activity and the adverse employment consequence. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997). Even where the plaintiff fails to show a close chronological relationship between the conduct and the consequence, plaintiff may illustrate a connection between the two. A complaint of harassment may cause a deteriorating relationship between the employer and employee which helps establish a pattern of antagonistic behavior followed through to and remaining consistent with retaliatory conduct. *See Robinson v. Southeastern Pennsylvania Transportation Authority,* 982 F.2d

892, 895 (3d Cir.1993). In considering a retaliation claim, a court should look not only at "individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990).

Bianchi has met his burden to survive summary judgment on this claim. In considering the facts in the light most favorable to him, Bianchi has presented sufficient evidence to raise the inference that his complaints about harassment, and not his mental health, caused the events leading up to his eventual termination from the fire department. It is undisputed that at some point in January 1998, Bianchi was placed on no-duty status and upon his return was assigned to the safety office of the Fire Academy. On January 20, 1998 a meeting was held at which plaintiff, the president of his union, an attorney representing plaintiff (hired by the union), and the battalion chief and special investigations officer, William Schweizer, were present. (Deposition of Bianchi, 63–64). At that time, Bianchi was informed of the department decision to initially remove him from active duty and place him in an office job. Though the City contends that the decision was based on concerns for plaintiff's health and safety, on November 29, 1997, Bianchi had threatened to report the incidents of harassment and the department's inattention to them to the police, his union, and the civil service commission. (Memoranda dated November 29, 1997 from Bianchi to Commissioner Hairston and Battalion Chief Drennen). The parties agree that only several days before this meeting Battalion Chief Schweizer had been contacted by Thomas O'Drain, vice-president of Local 22, plaintiff's union, on behalf of Bianchi. The

close proximity between the initial involvement and an outside organization makes it possible to conclude that the real motive for moving Bianchi was to retaliate for enlisting the aid of his union. The "temporal proximity" of Bianchi's threat to complain to outside organizations and his removal from active duty is sufficient to raise the inference that the defendant was not truly motivated by their concern about the mental stability of the plaintiff.

Similar inferences might be drawn from the requirements imposed on Bianchi before he was permitted to return to duty. Bianchi contends that the department created additional, unnecessary hoops in order to prevent him from rejoining the department. Though the department claims Bianchi failed to comply with the standard requirements mandated by the City's Medical Director, Dr. Hayes, the plaintiff presents evidence that atypical things happened concerning his return to work. After his own doctor and the City's contract psychiatrist, Dr. Arce, had cleared him to return to work, Hayes agreed with that decision. However, he subsequently disregarded it. (Deposition of Bianchi, 138–39). Though not certain, it is possible that Dr. Hayes spoke with Battalion Chief Schweizer during this same period of time (Deposition of George Hayes, M.D., 19). Less than one month after Bianchi had been deemed fit to return to work, Dr. Hayes wanted Bianchi to submit to additional testing and submit other medical records before issuing clearance for his return to active duty (Letter dated November 10, 1998 from Dr. George Hayes to Bianchi).[12] It is not clear whether this sequence of events was unusual or simply standard department procedure. However, when considering the facts in the light most

---

12. The results of the additional testing are not relevant to this inquiry. Rather, it is the decision to require additional testing after a psychiatrist had decided it was proper for Bianchi to return to work that raises the inference of pretext.

favorable to the plaintiff, its close link to repeated complaints of harassment and filings with the EEOC on September 1, 1998 again raises the inference of irregularity. Considering the "overall scene," including the antagonistic pattern of behavior and somewhat hostile relationship between the City and Bianchi, it is reasonable to conclude that the City refused to return plaintiff to work based upon retaliatory motives rather than concerns about his psychological well-being.[13]

In deciding whether to grant summary judgment, the key question "remains whether a reasonable jury could conclude that [plaintiff] was discharged because she engaged in protected activity." *Aman*, 85 F.3d at 1085. Bianchi's activities were protected activity. Based on the record before me, I conclude that Bianchi has presented enough evidence from which a factfinder could infer that defendant's contentions of legitimate, non-retaliatory purposes is pretextual and that he was discharged for pressing his sexual harassment claim. Therefore, I will deny summary judgment on Counts III and IV.

### Count V–A: Constitutional Due Process Rights Under § 1983

▬▬▬▬ Bianchi also claims that his civil rights were violated as he was deprived of procedural due process pursuant to 42 U.S.C. § 1983. In order to state a successful claim for violation of procedural due process pursuant to that statute, the plaintiff must demonstrate (1) an interest included within the Fourteenth Amendment's protections for property and liberty and (2) that the state deprived him of that protected interest without requisite notice or some type of hearing. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 33 L.Ed.2d 548

(1972); *Independent Enterprises Inc. v. Pittsburgh Water and Sewer Authority*, 103 F.3d 1165, 1177 (3d Cir.1997). Not all public employees have a property interest in their employment. It is more than a "unilateral expectation" of continuing employment and instead must be a "legitimate claim of entitlement." *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. An express contract, a tenured position, or a "clearly implied promise of continued employment" may create this right. *Id.* at 576, 92 S.Ct. 2701. The legislature can also create this right by statute. *See Larsen v. Senate of Commonwealth of Pennsylvania*, 154 F.3d 82, 92 (3d Cir.1998); *Carter v. City of Philadelphia*, 989 F.2d 117, 120 (3d Cir. 1993).

▬▬▬▬ Once the plaintiff has established a legitimate, protected property interest, he or she must then show that the state failed to provide adequate protections prior to the deprivation of that right. Generally, this process takes the form of a pre-deprivation hearing, though in some emergency situations, the employer can postpone the hearing until after the deprivation. *See Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The extent of protections afforded vary on a case by case basis and can be determined by balancing the factors articulated by the Supreme Court in *Mathews v. Eldridge*. In determining the appropriate process, the court must consider (1) the liberty or property interest at stake in the matter; (2) the value of a procedure in protecting that right; and (3) the efficiency interests of the government in providing the procedure. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

---

**13.** These examples are not intended as an exclusive list of events which raise an inference of pretext but instead illustrate that plaintiff has advanced sufficient evidence to sustain his burden on summary judgment.

In the instant case, the City contends that Bianchi has failed to demonstrate that he had a protected property interest in his job with the fire department. Defendants implicitly concede that at one point in time Bianchi did have a protected property interest in his job as a twenty year veteran of the fire department. The Civil Service Regulations of the City of Philadelphia support this concession as the regulations create procedures to be followed prior to termination or adverse employment consequences in a variety of situations. *See Robb v. City of Philadelphia,* 733 F.2d 286, 292–93 (3d Cir.1984) Defendants argue, however, that Bianchi could have no reasonable expectation of continuing employment in light of the letters sent to his home concerning expiration of his leave time. (Letters dated March 9, 1999 and November 4, 1999 from Ronald Augustyn to Bianchi). In failing to comply with the requirements imposed by Dr. Hayes or by not seeking a medical leave of absence, Bianchi forfeited the "legitimate claim of entitlement" required by *Ross* and voluntarily abandoned his position.

 Bianchi has presented enough evidence to raise the inference that he did not voluntarily abandon his position. Plaintiff claims that the evidence shows the requirements imposed by the fire department, rooted in its retaliatory motive, compelled him to abandon his position. Though the City contends that they clearly explained the requirements for return (Affidavit of George Hayes, M.D., June 18, 2001), Bianchi claims that the necessary steps were never explained to him. (Deposition of Bianchi, 138–39). Even if the City definitively showed that they had told

Bianchi precisely what he needed to do, because Bianchi has raised the required inference that these practices were aberrant and designed to target him, their imposition would amount to constructive discharge. Bianchi's situation is comparable to that of an employee forced to submit a resignation under duress. While the assumption is that generally a resignation is a valid relinquishment of the right to employment, when coerced or a product of agency deception, the law treats it as though the employer terminated the employee. *See, e.g., Christie v. United States,* 207 Ct.Cl. 333, 518 F.2d 584, 587–88 (1975). Further, at the time the City began to advise Bianchi of the impending end òf his leave time, the parties do not dispute that he had already secured an injunction ordering his return to work and the City had not reinstated him. These undisputed facts, again raise the reasonable inference that the fire department had already decided to terminate Bianchi's employment. Bianchi's initiation of the current lawsuit in federal court, filed on May 11, 1999, prior to his official "separation," from the fire department further supports the inference that Bianchi did not voluntarily abandon his employment and therefore relinquish his legitimate claim of entitlement to it.[14]

 Though Bianchi has demonstrated a protected interest in his job sufficient to survive summary judgment, he must also raise a reasonable inference that the procedure followed by the department in effecting his separation fails to satisfy constitutional due process requirements. In response to the defendant's motion for summary judgment, Bianchi simply con-

---

**14.** The City urges that a decision of the Unemployment Compensation Board of Review, from April 11, 2000, finding that Bianchi was ineligible for benefits because he had "voluntarily" left work, should be given preclusive effect on this issue. That contention is incorrect as a matter of law. *See Swineford v. Snyder County of Pa.,* 15 F.3d 1258, 1266–69 (3d Cir.1994).

tends that "he was denied due process when the City refused to reinstate him." (Pl.'s Resp. to Def.'s Mot. for Summ. J., 74). The City argues it is entitled to summary judgment on this claim because they provided Bianchi with notice of the requirements for reinstatement. Bianchi's failure to take advantage of the numerous opportunities to secure reinstatement, of which the defendant fully advised him, caused his separation, not any action on the part of the defendant. During this same time, the City contends it remained in full compliance with the appropriate civil service regulations.[15] (Letters dated March 9, 1999 and November 4, 1999 from Ronald Augustyn to Bianchi). The Philadelphia Civil Service Regulations, on which defendants rely, describe the provisions and processes concerning leaves of absence and leaves of absence without pay and carry the same force and effect as the law in governing the employment relationship between the City and its workers and deviation from them amounts to a violation of the law. *See Robb*, 733 F.2d at 292–93 (3d Cir.1984).

Plaintiff, however, insists he did not have this opportunity to secure his return to work. First, he argues that the defendant constructively discharged him prior to November 9, 1999, the date of his official "separation" and therefore the cited civil service regulations are inapplicable to him. Though Bianchi admits that initially he took a voluntary medical leave of absence from his position, (Deposition of Bianchi, 79), that leave became involuntary when the City refused to reinstate him after he received medical clearance from his own physician to return and got a court order requiring his reinstatement that defendants did not honor. Therefore, he was no longer on a leave of absence at the point his "separation" from the fire department became official.[16] Even if the City properly followed the regulations and those regulations actually applied to his situation, the plaintiff argues the defendant has not satisfied its obligations pursuant to due process requirements. Because the regulations place the decision of whether or nor to grant leave in the hands of a single individual, with no right to a hearing, the regulations violate due process of their face. Finally, Bianchi counters the defendant's assertion by contending he had no notice of the requirements for reinstatement. (Deposition of Bianchi, 138–139).

Plaintiff's due process claim and the defendant's response to it are unclear. Based on the arguments contained in the pleadings and the evidence on the record, I am unable to conclude that the defendant unquestionably satisfied the requirements of procedural due process. Therefore, it is

**15.** The provisions provide that any employee absent without a valid leave will be deemed to have abandoned his position and tendered a resignation unless within ten days, he provides information which renders his absence excusable, as determined by the director of the civil service commission. (Philadelphia Civil Service Regulations, 22.01). The next provision provides the opportunity to secure a leave without pay, again subject to the approval of the director. The denial of a request for such leave amounts to a separation from the employer. However, an employee has thirty days to appeal the denial to the commission. (Philadelphia Civil Service Regulations, 22.02, 22.021).

**16.** Though the Commonwealth Court eventually overturned this order, the City appealed it without a stay (Deposition of Bianchi, 108). The parties have provided virtually no information about the injunctive order, but based on what little evidence made a part of the record, the City chose to remain in contempt of a court order while filing their appeal, rather than return the plaintiff to work. This resistance to reinstating the plaintiff raises the inference that the continuation of his leave was not voluntary.

inappropriate to grant summary judgment at this time and I will deny the defendant's motion for summary judgment on Count V–A. However, I am willing to revisit this issue prior to trial in the form of a motion in limine, at which time I expect both plaintiff and defendant to have more clearly articulated their due process claims.

### Count V–B: Violation of Constitutional Free Speech Rights

 Plaintiff brings a second claim under 42 U.S.C. § 1983,alleging a substantive due process violation, namely that the defendant violated his constitutionally protected right of free speech. Plaintiff must demonstrate two things in order to prevail on this claim: (1) that the speech in question falls within the protections of the First Amendment and (2) that the expressive activity motivated the defendant to discharge, or take other adverse employment action, against the plaintiff. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 975 (3d Cir.1997). The First Amendment does not protect all speech and when the government acts as an employer, it may constitutionally limit some speech in the workplace. However, a public employee does not forfeit all First Amendment protections. If the speech addresses a matter of public concern and also prevails in a balancing of its value against its disruptive effects, then it falls within the safeguards of the Constitution. *See Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

 Plaintiff must first show that the speech in question was a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). While courts have interpreted "matters of public concern" broadly, its meaning is not without limits. In considering what constitutes such a matter, courts may look to the "content, form, and context" of the speech. *Holder v. City of Allentown,* 987 F.2d 188 (3d Cir.1993) *quoting Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. If the speech relates to something that can be "fairly considered as relating to any matter of political, social, or other concern to the community," then it is a matter of public concern. *Id.* at 147, 103 S.Ct. 1684. The Third Circuit instructs that where a public or elected official is the subject matter of the speech, it is more likely to relate to this process and therefore is more likely to be protected by the First Amendment. *See Azzaro* 110 F.3d at 968. In *Azzaro,* the plaintiff was discharged from her job with the county after reporting an incident of sexual harassment by the assistant to an elected county commissioner. The plaintiff, however, never took her complaint public, and asked her supervisors, to whom she had reluctantly reported the incident, to keep the grievance confidential. Still, the court found that Azzaro's communications were a matter of public concern because the content of her complaints, if made public, "would be relevant to the electorate's evaluation of the performance of the office of an elected official," and touched on issues of public trust. *Id.* at 978. In so holding, the decision expressly rejected a number of distinctions that other circuits had adopted to differentiate between matters of public and private concern and opted instead for a more flexible approach to First Amendment retaliation claims.[17]

---

**17.** The Third Circuit rejected the following distinctions: (1) the public employee as employee versus the public employee as citizen approach used by the Tenth and Eleventh Circuits; (2) the employee attempting to take his or her grievances public compared to the employee who wished to keep the speech quiet as used by the Seventh Circuit; and (3) the Second Circuit's approach to sexual harassment complaints which protects only those claims indicating a systematic problem

■ Though the Third Circuit refused to limit itself to a particular test, the court also cautioned against the uniform acceptance of sexual harassment complaints as a matter of public concern per se. However, the court did find that an individual instance of sexual harassment by a supervisor who was also a public authority was, in this case, sufficiently related to self-governance so as to constitute a matter of public concern.[18] *See id.* at 980. Judge Becker issued a concurring opinion, reiterating the idea that harassment claims do not qualify automatically as matters of public concern and illuminating a number of circumstances in which a claim will not be protected. These include the single-incident of harassment by a co-worker rather than a supervisor referred to in the majority opinion, and also instances where "the offender is a non-supervisory co-worker and the incident is more than 'isolated,' though neither egregious or repeated with great frequency." *Id.* at 981 (Becker, C.J., concurring). Other "non-public" matters include instances where the " 'powers that be' " remain unaware of the harassment, where the action complained of is minor or suspect, where the credibility of the claimant is doubtful, or some combination of these factors. *Id.*

The allegations and evidence in the instant matter do not neatly fall into one of the above mentioned categories. Bianchi presents evidence of recurring, serious incidents of harassment by his co-workers of which he made his superiors aware in 1997. Though the City makes much of Judge Becker's reference to instances of harassment by a non-supervisory co-work-

er, they conveniently omit the language in the same passage that specifies that the harassing incidents be less than egregious and that they not be recurring in order to be considered private concerns. When members of the fire department are spending their time placing used condoms in co-workers drawers, drafting fictitious letters, and threatening their co-worker either because they believe he is gay or are unhappy with his leadership style, it is a matter of public concern. Not only was Bianchi speaking out against his own treatment, he exposed conduct that might cause a public outcry about the general fitness and discipline within an important public institution. Even though the harassment he experienced may have fallen outside of the protections of Title VII, Bianchi was still entitled to voice his concerns about practices within the Philadelphia Fire Department and in doing so engaged in conduct protected by the First Amendment.

■ Once it is determined that plaintiff's speech is a matter of public concern, in order to be protected, it must prevail in the balancing of the employee's interest in speaking out and the level of public concern against the employer's interest in providing efficient service. *Id.* at 980. Bianchi possessed an important interest in airing his grievances both within and outside of the fire department. His harassers engaged in a serious and repetitive pattern of conduct which disrupted his job performance and his life. As noted, the public has an important interest in assuring that vital institutions like the fire department function fairly and effectively. The defen-

---

or widespread corruption. *Azzaro,* 110 F.3d at 979–80.

**18.** Azzaro claimed that when she went to meet with a co-worker, he shut the office door and attempted to pull open the lapels of her blazer, and put his hand inside her jacket,

successfully untucking her shirt from her pants. He then unzipped his own pants and placed his hands inside. When Azzaro yelled loudly, her harasser stopped his conduct immediately and resumed a professional demeanor. *See id.* at 970.

dant has not proffered any example of how Bianchi's speech disrupted the efficient functioning of the department. While the defendants spent time and resources investigating the claim, they do not contend that the efficiency gains took precedence over Bianchi's free speech rights. Therefore, Bianchi has demonstrated that his conduct constitutes protected activity within the parameters of the First Amendment.

■ Under *Azzaro,* deciding that the plaintiff engaged in protected conduct does not end the inquiry as to whether the plaintiff withstands the motion for summary judgment. Plaintiff must also advance sufficient evidence that his reports of harassment caused the adverse employment action he suffered Bianchi were motivated by his reports of harassment. *Id.* at 975. The defendant challenges Bianchi's proffered reason for his eventual separation from the department, again advancing the theory that Bianchi's mental fitness and his refusal to comply with requirements for reinstatement, caused his dismissal. As discussed in relation to Bianchi's Title VII retaliation claim, *see supra,* the temporal proximity and general sequence of events raise the inference that he was discharged for speaking out concerning the harassment he suffered. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997). Because the plaintiff has engaged in protected activity and because he has raised a reasonable inference this activity motivated the fire department to discharge him, summary judgment is inappropriate. The City of Philadelphia's motion for summary judgement on Count V–B will be denied.

### Count VI: Violation of Constitutional Right to Petition the Courts

In a separate count, Bianchi alleges that the defendants violated his constitutional right to petition the courts in violation of 42 U.S.C. § 1983. The Supreme Court has consistently held that the right to access the court system falls under the First Amendment protections, namely as a part of the right to petition the government. *See Anderson v. Davila,* 125 F.3d 148 (3d Cir.1997) *citing California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In their summary judgment motion, the defendants do not specifically address this count, nor does the plaintiff in his response. I assume that this count refers specifically to the state court action instituted by Bianchi to obtain reinstatement, while the previous count refers more generally to his public complaints about sexual harassment.

While the counts are separate, the analysis employed to consider the claims is identical. The plaintiff engaged in protected conduct when he sought relief in the courts from the harassment and alleged retaliation. The causal connection between these actions and the adverse consequences suffered by Bianchi cannot be decided on a motion for summary judgment because as noted throughout this opinion, the plaintiff has presented sufficient evidence to raise the inference of retaliation, rendering summary judgment inappropriate. Therefore, the defendants' motion for summary judgment is denied with respect to Count VI, the violation of the First Amendment right to petition the courts.

### Count VII: Intentional Infliction of Emotional Distress

■ In the final count of his complaint, Bianchi alleges that the defendants committed the intentional tort of intentional infliction of emotional distress, in violation of the Pennsylvania common law. The defendants again move for summary judgment, contesting the factual allegations, but more compellingly, based on their gov-

ernmental tort immunity. Pennsylvania law creates a generalized governmental immunity for all injuries to people and property and enumerates eight limited exceptions to this immunity. *See* 42 Pa.C.S. § 8541. These exceptions concern (1) operation of a motor vehicle; (2) personal property in the care, custody, or control of a local agency; (3) real property in similar care; (4) trees, traffic controls, and street lights; (5) facilities providing utility service; (6) streets; (7) sidewalks; and (8) care, custody, and control of animals. *See* 42 Pa.C.S. § 8542.

It is apparent that Bianchi's claims do not fall within any of the exceptions to governmental immunity. While the plaintiff correctly describes the elements of the intentional infliction of emotional distress tort, he does not address the immunity issue. I can only conclude this is because there is none. Because under Pennsylvania law the defendants are entitled to immunity, I will grant their motion for summary judgment on Count VII of the plaintiff's amended complaint.

### ORDER

**AND NOW** this day of January 2002, it is **ORDERED** that:

(1) The plaintiff's complaint is **DISMISSED** on all counts against the Philadelphia Fire Department.

(2) The defendants' motion for summary judgment is **GRANTED** as to the following counts of the plaintiff's amended complaint: Count I, violation of the Civil Rights Act of 1964; Count II, violation of the Pennsylvania Human Relations Act; and Count VII, the intentional infliction of emotional distress.

(3) The defendants' motion for summary judgment is **DENIED** as to the following counts of the plaintiff's amended complaint: Count III, violation of the anti-retaliation provision of the Civil Rights Act of 1964; Count IV, violation of the anti-retaliation provision of the Pennsylvania Human Relations Act; Count V–A, violation of plaintiff's constitutional due process rights; Count V–B, violation of plaintiff's constitutional free speech right; and Count VI, violation of plaintiff's constitutional right to petition the courts.