Dawn DAWSON, Plaintiff,

v.

BUMBLE & BUMBLE, Defendant.

No. 01 Civ. 8814(VM).

United States District Court,
S.D. New York.

Feb. 24, 2003.

Rick Ostrove, Leeds, Morelli & Brown, P.C., Carle Place, NY, for plaintiff.

Ellen M. Martin, Patterson, Belknap, Webb & Tyler, New York, NY, Kathleen L. Jennings, Patterson, Belknap, Webb & Tyler, L.L.P., New York, NY, for defendant.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiff Dawn Dawson ("Dawson") brought this action alleging employment discrimination by defendant Bumble & bumble, LLC ("Bumble" or the "Salon") on the grounds of sex, gender, sex stereotypes, and/or sexual orientation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), Executive Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code, Title 8. Before the Court is Bumble's motion for summary judgment. By Order dated January 30, 2003, the Court granted the motion and indicated that its findings, conclusions and reasoning would be set forth in a separate decision to be provided to the parties.

## I. *FACTS*

Dawson commenced employment as a hair assistant at Bumble's "high-end" beauty parlor in midtown Manhattan in February 1999. When she started at the Salon, Dawson had seven years of prior experience in hair cutting and styling. She had worked as an assistant in the educational programs of three Manhattan hair studios, which she left before completing each course, and at several other smaller shops that did not require training classes. At Bumble, she was interviewed and hired by the Salon's Manager, Connie Voines ("Voines"), who was in charge of supervising employees and directing operations at the Salon's floor, including work assignments and performance evaluations.

Bumble hires assistants who aspire to be hairdressers to work on the floor of the Salon four days per week and to participate in its educational program on the fifth day. The employment consists of performing various tasks for an assigned hair stylist. These duties include greeting and escorting clients, serving them beverages, shampooing and blow-drying their hair and cleaning the stylist's tools and workstations. Bumble's educational training, which the assistant must satisfactorily complete in order to be promoted to work as a hair stylist at the Salon, requires advancement through four successive levels of classes in Bumble's hair cutting and styling methods: basic blow-drying, basic scissor cutting, basic razor cutting and advanced razor.

To enable assistants in the basic classes to develop their skills, they are required to recruit for the class every Monday four models on whom they practice shampooing, blow-drying and applying the Salon's hair cutting and styling techniques. For this purpose each model's hair must have the necessary length, style and texture to enable the assistant to perform the haircut being demonstrated during the given day's instruction. As a supplement to the training, the educational program also periodically schedules more limited special seminars, usually consisting of six Tuesday classes for a smaller number of selected assistants, concentrating on advanced styling and "editorial" hairdressing of professional models for photographic print advertising and promotion of Bumble products and techniques.

For assistants to advance from the basic classes, the Salon requires them to demonstrate satisfactory skills in executing four particular haircuts: the bob, the graduated bob, long layers and short layers. In addition, the program considers the assistant's general attitude, work ethic and interpersonal skills. According to Bumble, it typically takes an assistant between two and three years to successfully complete the Salon's educational program and graduate

to stylist, and only 10 to 15 percent of those hired are so promoted.

Bumble contends that Dawson did not advance to stylist and was not selected for the advanced seminars because, after seventeen months in the program, she never satisfactorily finished the most essential part of her training, mastery of all four basic haircuts, and because her general attitude, work ethic and overall performance were inadequate.

Not surprisingly, the parties present sharply conflicting versions of Dawson's performance in the Salon's training program and her work on the floor. According to Dawson, she was fully qualified to be a hair stylist by reason of her prior experience and her work at the Salon, which she claims was consistently praised by Voines, by Elizabeth "Coco" Santiago ("Santiago"), the Salon's Educational Coordinator, by other Salon stylists for whom she worked, and by clients, thus giving her confidence that she would graduate expeditiously from assistant in the training program to full stylist. In support of her contention, Dawson introduced the deposition of Monica Cunningham ("Cunningham"), one of the stylists in the Salon's educational program. Cunningham testified that she regarded Dawson as a very good assistant who had done an exceptional job at the Salon and that she thought the Salon's other staff and clients were fond of her. (Deposition of Monica Cunningham, attached as Exhibit "Cunningham Dep" to Declaration of Rick Ostrove dated October 7, 2002 ("Ostrove Dec."), at 108–109.) Dawson also presented an affidavit of Amy Strober, a former Head Assistant at the Salon, who stated that she had reported to Bumble her view that Dawson had done an excellent job as a hair assistant. (Affidavit of Amy Strober dated March 6, 2001, attached as Exhibit "Strober Aff" to Ostrove Dec.)

By contrast, Bumble portrays Dawson's performance, both as an assistant and on the Salon's floor, as too erratic and inadequate to warrant promotion to stylist. Bumble contends, for example, that on Mondays Dawson frequently failed to recruit sufficient or appropriate models to perform the required haircuts. (Deposition of Elizabeth Santiago ("Santiago Dep."), attached as Exhibit G to Amended Declaration of Ellen M. Martin ("Martin Dec.") dated August 22, 2002, at 25, 27.) Voines testified that Dawson's overall performance was "below average", that she was frequently late and in a bad mood, resentful of the work assigned to her and easily frustrated, that she demonstrated poor attitude when asked to perform her work tasks, and that she received a very bad evaluation from Ralph Formisano ("Formisano"), one of the last stylists Dawson worked for before being fired. (Deposition of Connie Voines, attached as Exhibit F to Martin Dec., at 42–43, 46–48, 127.) Santiago stated that Dawson's class work was not up to standard, that she did not listen to the teachers' directions, that often she seemed like she did not want to be at work and said so, and that other teachers similarly expressed unhappiness with Dawson's work. (Santiago Dep., attached as Exhibit M to Reply Declaration of Ellen M. Martin ("Martin Reply Dec.") dated November 14, 2002, at 36, 37, 43, 52.) According to Voines and Santiago, after more than one year in the Salon's training program, Dawson had not yet demonstrated sufficient technical mastery of three of the four basic hair cuts the Salon required to graduate assistants to the next level of training. (Voines Dep. at 125; Santiago Dep. at 28.)

Voines and Santiago also testified that Dawson was considered by other Salon stylists as rude, abrupt, hostile, unfriendly and disrespectful, and that several stylists

and clients had registered complaints to that effect. Some stylists refused to work with Dawson, and asked Voines not to assign Dawson to work with them. (Voines Dep. at 119, 122, 123; Santiago Dep., Ex. M at 52, 54; Dawson Dep. at 276–80.) For example, Sharon Morrissey, one of the Salon stylists with whom Dawson was working at the time she was terminated, testified that two or three clients complained that Dawson was unfriendly, and that one of them asked that Dawson not be assigned to touch her hair again. Morrissey further stated that Dawson was "not so great" about cleaning up hair around the station, that as to blow-drying hair she was "average" but "definitely did have a long way to go", and that while Dawson's performance working with Morrissey was satisfactory, "that's not the way she was overall in the salon." (Deposition of Sharon Morrissey, attached as Exhibit N to Martin Reply Dec., at 11–13, 20–22.) Morrissey also remarked that Dawson was sometimes moody and when she was in a bad mood she could be short, causing Morrissey to be "a little bit fearful of what would happen if I left her alone with the client for a little bit too long." (*Id.* at 22.) According to Morrissey, "at Bumble & Bumble [sic] it is very, very, very important to have a great attitude. That comes first. Great attitude, positive energy towards anyone no matter who you are or what type of mood you may be in." (*Id.*)

From these vastly contradictory assessments of Dawson's skills and work at the Salon, emerge two diametric versions of why she did not advance to stylist and why she ultimately was dismissed on July 15, 2000. As the reasons why Dawson was not promoted and was later dismissed, Voines enumerates Dawson's inadequate performance and poor attitude and the various difficulties recounted above that Dawson experienced with the Salon's stylists, teachers and clients. Dawson, on the other hand, attributes the Salon's failure to promote her from the education program, its denying her participation in advanced styling classes, and its decision to terminate her employment, to unlawful discrimination. Specifically, Dawson contends that she was the victim of a hostile work environment and adverse employment actions at the Salon on account of sex, gender, sexual stereotyping, and sexual orientation, in particular because she is "a lesbian who does not conform to gender norms." (Dawson Dep. at 185–86, 496; Complaint ("Compl.") ¶¶ 34, 35.) Hence, the instant lawsuit.

Dawson claims sex discrimination on the ground that, though she felt qualified and ready, she was not promoted from basic scissor cutting to razor class and was denied opportunities to take advanced styling and editorial styling. These claims are predicated on certain statements Voines allegedly made in response to Dawson's request for permission to attend the advanced styling classes. Voines made remarks to the effect that few women were seen doing editorial styling.

The hostile work environment claim Dawson asserts is founded on three incidents involving comments made by certain Bumble employees. First, Dawson describes offensive remarks allegedly made by Raymond and Howard McLaren (collectively the "McLarens"), brothers who worked as stylists at the Salon and who Dawson claims had a significant role in the creative end of the Salon's services. Dawson also contends that the McLarens were involved in hiring, firing, promoting and providing advancement opportunities at the Salon. According to Dawson, sometime after she began at the Salon, the McLarens, first Raymond, and later Howard when the two saw Dawson together, commenced habitually calling her "Donald", rather than by her real name,

"Dawn". Dawson interpreted the context of this nicknaming to be "demeaning" and "not in a joking manner." (Dawson Dep. at 248–49, 255–56.) Dawson claims she twice reported the incident to Voines, once at the time it started six to eight months after she was hired and the second time towards the end of her employment, and that Voines "kind of laughed and walked away." (*Id.* at 246, 250–52, 258.)

■ The second specific instance of sexual harassment Dawson cites is a comment by Formisano, who allegedly told her that "[h]e thought the general consensus was that the way [Dawson] dressed was a costume...."[1] (Dawson Dep. at 198–200.) Dawson testified that Formisano did not elaborate on the remark, nor comment as to how he thought she should dress, and that although the comment upset her, she did not report it to anybody at the Salon. (*Id.* at 200–202.)

Dawson's third specific example allegedly evidencing the Salon's hostile working environment entails a comment made by Deniz Uzunoglu ("Uzunoglu"), one of the hair assistants at the Salon, who said to Dawson: "You know, what you need, Dawn, you need to get fucked." (Dawson Dep. at 266.) Dawson again asserts that Uzunoglu's comment upset her but that she did not report it to Voines. In fact,

Dawson acknowledges that it was Voines who brought that remark to Dawson's attention. (*Id.* at 269.)

In addition, Dawson asserts as part of her sexual harassment claim another remark Uzunoglu made, conveyed to Voines by another Salon employee and to Dawson by Voines, to the effect that Dawson and Voines should switch body parts. (Dawson Dep. at 269–70, 272, 366–67.) Dawson testified that when Voines reported Uzunoglu's comments, she informed Dawson that Voines had fired Uzunoglu on account of these comments but had decided to give him another chance when he begged for his job back, (*id.* at 270), and that Dawson agreed to drop the matter and give him another chance, (*id.* at 273–74).

The comments on which Dawson bases her discriminatory discharge claim allegedly were made to her by Voines at the time she was terminated. According to Dawson, Voines made reference to Dawson's haircut, which Dawson had recently cut very short, stating "that it was not acceptable and that she could not send [Dawson] to New Jersey ... as an example, because she couldn't send [her] out to do product work, that [Dawson] would scare people." From these comments, Dawson inferred that the reason she was fired "was basically about the way [she] looked." (*Id.* at 283.)

---

1. In opposition to the instant motion, and in a supplemental affidavit accompanying her brief, Dawson argues that Formisano's comment referred to his view that Dawson "wore [her] sexuality like a costume." (Dawson Affidavit dated October 4, 2002, attached as Ex. "Dawson Aff" to Ostrove Dec., ¶ 5; Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment dated October 7, 2002 ("Pl.'s Mem.") at 12.) The Court cannot countenance Dawson's attempt on this point, and other instances referred to below, to supplement or amend her deposition, so as to contradict or put a different gloss on particular testimony she gave under oath in the presence of her counsel. *See Raskin v. Wyatt*

*Co.,* 125 F.3d 55, 63 (2d Cir.1997) (applying the rule in this Circuit that " 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.' ") (quoting *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996)); *see also Mack v. United States,* 814 F.2d 120, 124–25 (2d Cir.1987) (same). Dawson's deposition on this point is consistent and unambiguous. After extensive testimony and numerous references to the incident, she makes no mention of the allusion to "sexuality" in Formisano's remarks and repeatedly asserts that he was speaking specifically about her clothing.

Dawson also claims that Cunningham informed her, after Dawson's termination, of a conversation Cunningham and Santiago allegedly had with the McLarens over drinks at a bar near the Salon about one month before Dawson's dismissal. On that occasion, the McLarens allegedly referred to Dawson as a "dyke" and, asserting that they disliked her "dyke attitude," said they were going to fire Dawson. (Cunningham Dep. at 67.)

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

In considering a motion for summary judgment, a court may grant the motion only if, on the basis of the record of the pleadings, depositions, answers to interrogatories and admissions, together with any affidavits filed, it concludes that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68 (2d Cir.2000). The role of the court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The moving party bears the initial burden of establishing the basis for the motion and identifying those portions of the materials on the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 165 (2d Cir.2002). In this regard, "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In weighing whether the movant has satisfied this threshold, the court must view the record as a whole in the light most favorable to the opponent of the motion. *See id.* at 255, 106 S.Ct. 2505. The movant may meet this initial burden by demonstrating the absence of evidence sufficient to support an essential element of the opponent's underlying claim. *See LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998).

If the court finds that the moving party has satisfied his initial burden of persuasion, the opponent must then "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To this end, the opponent "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Rather, he must support with specific evidence his assertion that a genuine dispute as to material fact does exist. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

The opposing party's showing of a genuine dispute must be grounded on concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson,* 477 U.S. at 248, 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

### B. *CONTEXTUAL CIRCUMSTANCES*

Dawson invokes Title VII, the NYSHRL and the NYCHRL to assert claims of dis-

crimination on the basis of sex, gender, sexual stereotypes and sexual orientation. Assessing the merits of these claims is rendered uniquely challenging in this case by the singular setting in which the events occurred and against which whatever social and legal standards that govern are to be applied. That backdrop is critical. The Supreme Court has counseled that in adjudicating Title VII harassment claims, the offending conduct "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore, Servs. Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In all harassment cases, the Supreme Court further instructs that: "that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.... The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 81–82, 118 S.Ct. 998;[2] *see also Richardson v. NYS Dep't. Corr. Serv.* 180 F.3d 426, 437 (2d Cir.1999) (noting that the applicable standards "caution [ ] to consider the totality of the circumstances.... The factors must be considered 'cumulatively,' so that we may 'obtain a realistic view of the work environment.'" (internal citations omitted)).

Here, Dawson charges that wrongs were done to her by reason of her failure to abide by certain norms allegedly demanded of her at her workplace. Yet, she struggles to define precisely the behavioral rules by which she was judged and the particular ways in which those standards were unlawfully applied in her case. Dawson's dilemma may stem from the somewhat amorphous "constellation of surrounding circumstances, expectations, and relationships" she portrays as marking the world of hairdressers. *Oncale*, 523 U.S. at 82, 118 S.Ct. 998. In the work environment she describes, traditional social demarcations blur, roles shift and conventional definitions of what is the norm often fall short in fitting the social conduct portrayed. For instance, in relation to some of the events and individuals involved in the instant dispute, Dawson acknowledges that an evaluation of what constitutes conforming behavior is bound to run into "a tricky place" and "a very gray area." (Dawson Dep. at 379, 380, 381.) When asked about who at the Salon was considered unconventional, Dawson replied: "What is conventional to you? You're talking about hairdressers." (*Id.* at 377, 118 S.Ct. 998.) Pressed further to identify in particular which of the Salon's employees was a nonconformist, Dawson said: "I don't think hairdressers are conformists anyway, so I would say the whole lot of them." (*Id.* at 379, 118 S.Ct. 998.)

In fact, among the loading figures here, Voines, accused by Dawson of discharging her for failure to conform to gender norms, was a pre-surgery male-to-female transsexual who started at the Salon in 1985 as a "shampoo boy" and, at the time of the events in question, was transitioning from appearing male to appearing female.

---

**2.** In an illustration that underscores the overarching relevance and import of context as pertains to sexual harassment claims, the *Oncale* Court remarked: "A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." *Id.* at 81, 118 S.Ct. 998.

(Declaration of Connie Voines dated August 16, 2002 ("Voines Dec.") ¶ 25; Dawson Dep. at 379–80.) According to Dawson, however, Voines conformed to gender norms because she dressed and identified as a straight woman, despite that, by Dawson's own account, Voines "speaks about her own penis often enough." (Dawson Dep. at 388.) Formisano, whom Dawson charges with sexual harassment because of his remark about perceptions at the Salon regarding the style of Dawson's clothing, was known to Dawson to be openly gay. (*Id.* at 382.) Santiago, who played a dominant role in the decision not to promote Dawson from the basic hair cutting classes to the more advanced razor levels, was openly bisexual. (*Id.* at 131.) Dawson also acknowledged that there were several other openly gay men and lesbians among the stylists, colorists and assistants at the Salon during the seventeen months she worked there, including another transsexual transitioning from female to male. (*Id.* at 376–83.) According to Voines, two of the assistants to the owner of the Salon were openly lesbian, and one of them was promoted to a visible position in the Salon's public relations office. (Voines Decl. ¶ 26.) As to Dawson herself, she admits that she sometimes referred to herself at the Salon as a "dyke," and otherwise spoke openly about her sexuality, her sexual affairs and details of her personal life after work. (Dawson Dep. at 389, 128–29.) Yet, Dawson maintains that in this milieu of nonconformists she was a victim of sexual discrimination because she does not conform to gender norms.

Indisputably, a work environment as diverse as that of the Salon is bound to embody many lifestyles and sexual preferences and reflect varying physical appearances, overall looks, and different manners of hair dress and clothing. Some of these personal images, attitudes and affiliations may convey the hair stylists' own creative concepts that they may seek to promote to clients, fashion models and trend setters. Dawson, for example, specifically mentioned a "mohawk" haircut given to her by Raymond McLaren, one of the persons she accuses of sexual harassment, that she described as "very close," and "very short" on the sides, longer at the top and "more severe" than shaving her head or than the haircut for which she claims she was fired. (*Id.* at 294.) According to Voines, Dawson received the "mohawk" while serving as Raymond McLaren's model at a seminar the Salon held to showcase Bumble styles and products, and that haircut was then advertised to Bumble clients nationally. (Voines Dec. ¶ 30.) Arguably, in other social contexts, some of these styles and expressions may be perceived as extreme.

In this social context, two observations relevant to resolution of the dispute at hand may be weighty. First, the Salon and its business represent an aspect of the world of styles and fashion in which personal appearance often counts for much, if not everything. In such a setting, the way a person looks and dresses, whether a client or employee of the establishment, is bound to evoke comment, for good or ill, open or not. Indeed, it may be that the Salon would fail in its business mission if the products of its self-described "high-end" and "trendy" beauty enhancement labors were greeted with utter silence. Where the work environment by its very nature engenders criticism about personal mien, manner and styles, a court is well-advised to probe exactingly at challenges to such commentary arising uniquely from the social context, and to exercise corresponding caution when called upon to rule as a matter of law that remarks about a particular individual's appearance, that may be contextually grounded, give rise to a claim for sexual discrimination. *See Oncale,* 523 U.S. at 81, 118 S.Ct. 998.

Second, the heterogenous environment that strives for the avant garde and extols the unconventional, also renders peculiarly challenging any finding that would, for the purposes of applying the discrimination laws, endeavor to classify what behavior does or does not conform to gender norms, what look, gesture or bearing may or may not deviate from defined expectations of what is or is not acceptable social conduct.

Against this backdrop, with its many and variegated contrasts, its admitted blurriness and chiaroscuros, Dawson's claims of sexual discrimination, as she articulates them in the Complaint and elaborates in her deposition, take on somewhat protean quality, hard to grasp or pinpoint precisely what conduct she accuses of offending whatever behavioral norms she asserts govern the circumstances. At various times in her pleadings and testimony, she asserts that she was disparately treated because of the way she looked, because she was a woman, because she was not a man, because she was a lesbian, because she was a lesbian who did not conform to gender norms. Adding to the complexity, Dawson, perhaps aware of some of the conceptual challenges and legal obstacles her charges implicate, invokes a novel stereotyping theory that tests the elasticity of the law to encompass her grievances: that she was a victim of sexual discrimination because she is a lesbian who refuses to conform to gender norms. Conceivably, Dawson's variable statements could be attributed to an imperfect attempt to assert different causes of action under alternative theories, as is permissible under Fed. R.Civ.P. 8(e). In the final analysis, however, Dawson's claims prove fatally deficient for reasons detailed below.

In the distinctive work environment that the record here depicts as prevailing at the Salon, what misconduct by an employee against another constitutes sufficient deviation from societal rules to cross over the line into unlawful behavior prohibited by the discrimination laws, is hard to discern. This difficulty perhaps explains much of the apparent confusion and self-contradiction inherent in Dawson's own statement of her case. As a threshold matter, because the borders are so imprecise, it is not evidence exactly what conduct by Bumble Dawson claims as the gravamen of the claims she asserts on sex or gender grounds, as opposed to what actions she bases on sexual orientation or sexual stereotyping. Moreover, insofar as Dawson relies on a basis of discrimination that seems to be founded on her status as member of a subset, "a lesbian who does not conform to gender norms," the theory she essays is not readily definable. It suggests that the offender presumably would classify lesbians into types and distinguish between forms of discrimination so that the misconduct could then be parsed between actions prompted by animus based strictly on sex and sexual stereotyping, as opposed to those motivated instead only by sexual orientation or affiliations. In other words, under Dawson's hypothesis, Bumble would practice disparate treatment by kinds of homosexuality, discriminating against an admitted lesbian who looks and behaves more like a man than like a woman, and presumably not against another lesbian known to be openly gay but who does not display her sexual preference by any visible expression or appearance. (Dawson Dep. at 383–84.) [3]

---

**3.** At her deposition Dawson was asked whether "it's your view that you were discriminated against simply because you were a lesbian or whether being a lesbian would have been okay, it was being a lesbian combined with not conforming to gender norms that caused a problem?" She replied: "Yes, the latter answer." (*Id.* at 383.) In a similar vein, she testified that in her view it was acceptable at the Salon for a male to be gay as long as he

More to the point of the legal controversy now before the Court, though the starting point and crux of the purported distinction is between differently perceived lesbians, Dawson contends that the alleged unlawful sex discrimination entailed in this instance is really conduct predicated on gender or sexual stereotyping proscribed by Title VII, and not necessarily or solely on sexual orientation which would not be actionable under Title VII. By logical extension of her theory, while under the facts assumed, Dawson, as a lesbian fired allegedly for appearing too masculine, would be able to plead a Title VII claim recognized as sex discrimination, another open lesbian who does conform to gender norms and perceptions of femininity and who is fired by an employer solely because she is a lesbian—however discreetly and "conventionally" so—would not have a Title VII cause of action.

This Court, out of profound respect for the infinite capacities of the human psyche, takes nothing for granted in any encounter with the still unfathomed depths and obscure passions at work at the core of human behavior. It thus accepts the possibility that our mental designs and social impulses may be capable of perfecting and expressing personal discriminations stirred by even the most gossamer instincts. As the Supreme Court has observed, "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Castaneda v. Partida,* 430 U.S. 482, 499, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

But, even assuming that misconduct in furtherance of the distinctions Dawson purports to establish here would state a legally cognizable theory, the Court finds that Dawson's claims fail on several grounds. First, upon close scrutiny of her pleadings and elaboration of her claim during her deposition, it appears that, as articulated, the underlying basis for Dawson's claims is not discrimination because of sex but on account of her sexual orientation. Second, the evidence Dawson presents in support of her claims predominantly addresses the sexual orientation theory which emerges as the real gravamen of the challenge she asserts. Third, insofar as Dawson purports to state claims based solely on sex or gender stereotyping, the fragmentary evidence she adduces is insufficient to establish intentional discrimination on those grounds. Finally, in any event, even if Dawson satisfied the elements of a sexual discrimination claim on any cognizable theory, the Court finds that the evidence on the record is insufficient to sustain a reasonable determination that intentional discrimination, rather than the legitimate grounds Bumble proffers, was the real reason for the adverse employment actions Dawson alleges.

## C. *SEXUAL DISCRIMINATION*

To prove a *prima facie* case of discrimination under Title VII, a victim may establish her claim by means of the burden-shifting test enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The *McDonnell Douglas* formulation requires the plaintiff to demonstrate that she (1) was a member of a protected class, (2) was qualified for the job in question, (3) suffered an adverse employment action, and that (4) others similarly situated were more favorably treated. 411 U.S. at 803, 93 S.Ct. 1817. Once the plaintiff states a

appeared like a heterosexual male, but not if he looked effeminate. (*Id.* at 384.)

*prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. If the employer does so, the plaintiff must produce sufficient evidence to demonstrate that the employer's proffered reason was false and merely a pretext for intentional discrimination based on an impermissible ground. *See id.* at 804, 93 S.Ct. 1817. Throughout this framework, the plaintiff bears the ultimate burden of persuasion by a preponderance of the evidence that in taking the challenged adverse employment action the employer intentionally discriminated against her on account of her protected status. *See Hicks*, 509 U.S. at 507, 511–12, 113 S.Ct. 2742.

 Dawson asserts that as a gay woman she is in a protected class under the NYCHRL, and that for Title VII and NYSHRL purposes she is in a protected class because she is a woman and because she does not conform to gender norms.[4] Bumble challenges Dawson's contention, classifying her repeated statement that she is a "lesbian who does not conform to gender norms" as a subset of sexual orientation discrimination. (Amended Memorandum of Law in Support of Defendant's Motion for Summary Judgment dated August 22, 2002 ("Def.'s Mem.") at 8–9.)

Dawson counters that Bumble's characterization misreads her claim by suggesting that what Dawson asserted is that she did not give the appearance of a stereotypical lesbian, and that by her statement of the claim the reference she really intended is to how a woman should dress, look and carry herself. (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment dated October 7, 2002 ("Pl.'s Mem.") at 3.) In support of her interpretation of the phrase in question, Dawson cites to a statement in her Complaint, which asserts that Dawson "is a lesbian female, who does not conform to gender norms in that she does not meet stereotyped expectations of femininity and may be perceived as more masculine than a stereotypical woman." (Compl. ¶ 7.) Perhaps inadvertently, or perhaps engaging in attempted legerdemain,[5] in transposing that quote from the Complaint to the memorandum of law opposing the instant motion, the comma that appears after "fe-

---

**4.** Consideration of actions under the NYSHRL and NYCHRL generally parallels the standards and analysis applicable to Title VII claims. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000) (citing *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n. 1 (2d Cir.1999) and *Landwehr v. Grey Adver. Inc.*, 211 A.D.2d 583, 622 N.Y.S.2d 17, 18 (1st Dep't 1995)). Accordingly, the Court will focus its analysis on Dawson's federal Title VII claim, and its findings and conclusions with respect to Title VII should be understood as extending to Dawson's state and local claims as well in light of their common jurisprudence and doctrinal elements, with one caveat. The Court recognizes that a claim for discrimination based on sexual orientation is cognizable under the NYCHRL. Nonetheless, insofar as the Court concludes that the evidence here is insufficient to sustain a reasonable finding that intentional discrimination on the basis of sex was the reason for the actions Dawson asserts as Rumble's unlawful conduct against her, the same result follows as to Dawson's NYCHRL claim. *See id.*

**5.** Bumble has protested to the Court what it regards as improper litigation tactics on Dawson's part. Specifically, Bumble objects that in responding to the instant motion, Dawson employed her Local Rule 56.1 Statement for the purpose of supplemental legal argument and citation of deposition testimony not discussed elsewhere; contradicted her own deposition testimony; and repeatedly and materially miscited the record. (Reply Declaration of Ellen M. Martin dated November 14, 2002 ¶¶ 2–5.) The Court has examined Dawson's opposition papers in the light of Bumble's objections and concurs that the response contains substantial incidence of the practices to which Bumble has objected.

male" in paragraph 7 of the Complaint is deleted, and Dawson thus argues that the statement really expresses two distinct concepts: that Dawson is a lesbian and that she is also a female who does not conform to gender norms. (Pl.'s Mem. at 3.) The Court is not persuaded by the clarification and distinction Dawson strives to convey.

### 1. Sexual Orientation

■ Title VII does not encompass discrimination based solely on sexual orientation. *See Simonton v. Runyon,* 232 F.3d 33, 35 (2d Cir.2000) ("Congress's refusal to expand the reach of Title VII is strong evidence of congressional intent in the face of consistent judicial decisions refusing to interpret 'sex' to include sexual orientation."); *see also Bibby v. Philadelphia Coca Cola Bottling Co.,* 260 F.3d 257, 264–65 (3rd Cir.2001), *cert. denied,* 534 U.S. 1155, 122 S.Ct. 1126, 151 L.Ed.2d 1018 (2002); *Spearman v. Ford Motor Co.,* 231 F.3d 1080, 1084–85 (7th Cir.2000); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 259 (1st Cir.1999); *Wrightson v. Pizza Hut of Am., Inc.,* 99 F.3d 138, 143 (4th Cir.1996). Accordingly, insofar as Dawson purports to assert a claim of sexual discrimination under Title VII predicated on sexual orientation, or that the claim she endeavors to state, however otherwise characterized, has only sexual orientation as its actual gravamen, Bumble is entitled to summary judgment dismissing such claim.

### 2. Sexual Stereotyping

■ While it is settled that discrimination grounded on sexual orientation is not proscribed by Title VII, in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250–51, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a plurality of the Supreme Court recognized as actionable under the statute a claim of

discrimination based on the plaintiff's failure to conform to sexual stereotypes. There, plaintiff's consideration for partnership in the firm was deferred in part because she was perceived as "overly aggressive," "macho" and "somewhat masculine," and she was advised that in order to improve her chances she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235, 109 S.Ct. 1775. Finding that the employer's action gave rise to a sufficient basis for relief under Title VII, the Supreme Court declared: "As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for 'in [enacting Title VII] Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" *Id.* at 252, 109 S.Ct. 1775 (quoting *Los Angeles Dep't of Water and Power v. Manhart,* 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)).

In identifying the hallmarks of sex stereotyping, the *Price Waterhouse* Court suggested that the claim rests on an employer's action based on a belief that an employee of one gender either cannot or must not possess or display qualities stereotypically associated with perceptions and expectations of how the other gender should or should not look or behave. *See id.* at 250, 109 S.Ct. 1775 ("[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."); *see also Simonton,* 232 F.3d at 37 ("'Just as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he

did not meet stereotypical expectations of masculinity.'" (quoting *Higgins,* 194 F.3d at 261 n. 4)).

The Second Circuit has not ruled squarely on this issue. However, in *Simonton* the Circuit Court acknowledged that *Price Waterhouse* "implied that a suit alleging harassment or disparate treatment based upon nonconformity with sexual stereotypes is cognizable under Title VII as discrimination because of sex." 232 F.3d at 38. The *Simonton* panel nonetheless declined to reach the merits of the issue because the plaintiff there had failed to plead sufficient facts to support proper consideration of the claim. *See id.*

Other courts have held that sexual stereotyping discrimination is prohibited by Title VII and thus cognizable as a distinct basis for relief. *See Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 874 (9th Cir.2001); *Centola v. Potter,* 183 F.Supp.2d 403, 408–409 (D.Mass.2002); *Ianetta v. Putnam Invests., Inc.,* 142 F.Supp.2d 131, 134 (D.Mass.2001); *see also Bibby,* 260 F.3d at 262–63 (discussing the theory as a plausible basis for stating a Title VII claim without specifically ruling on it); *Higgins,* 194 F.3d at 259–60 (same); *Doe v. City of Belleville,* 119 F.3d 563, 580–81 (7th Cir.1997), *vacated and remanded on other grounds,* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998).

This Court need not reach the merits of the issue the *Simonton* Court left open as to whether a sexual stereotyping action is cognizable in this Circuit. For the purposes of addressing Dawson's arguments on the motion at hand, the Court, following the implications of *Simonton* and related precedents from other Circuits, accepts that a female, whether or not she also happens to be a lesbian, could state a sufficient Title VII claim if the evidence establishes that she suffered an adverse employment action "because of sex" in that she was perceived as not conforming to stereotypical images and expectations of how a woman should or should not look like or behave.

■ However, even assuming that sex stereotyping may give rise to a cognizable sex discrimination action, Dawson's claim is unavailing. For, "[r]emarks at work that are based on sex-stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on [the plaintiff's] gender in making its decision." *Price Waterhouse,* 490 U.S. at 251, 109 S.Ct. 1775.

Here, a close probing of the evidence on the record indicates that what Dawson's theory seeks to do is to "bootstrap protection for sexual orientation into Title VII ..." under the guise of sexual stereotyping. *Simonton,* 232 F.3d at 38; *see also Oiler v. Winn–Dixie Louisiana, Inc.,* No. Civ. A. 00–3114, 2002 WL 31098541, at \*8 (E.D.La. September 16, 2002) (rejecting a cross-dresser's claim of discriminatory discharge for failure to conform to gender stereotype where the evidence failed to establish that plaintiff was discriminated against because he was perceived as being insufficiently masculine); *Trigg v. New York City Transit Auth.,* No. 99 Civ. 4730, 2001 WL 868336, at \*6 (E.D.N.Y. July 26, 2001) (noting that plaintiff's words and his own perception of the import of the alleged harasser's taunts "compel the conclusion that sexual orientation and not gender stereotyping are the *sine qua non* of his grievance."); *Bianchi v. City of Philadelphia,* 183 F.Supp.2d 726, 736–37 (E.D.Pa. 2002) (finding inference of sex discrimination in allegations of stereotyping "too attenuated" to meet plaintiff's burden on a summary judgment motion).

Ordinarily, in considering a motion for summary judgment, the Court is obliged

to resolve ambiguities and draw reasonable inferences in favor of the non-movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Here, however, the Court does not deem the parties' disagreement over Dawson's statement of the basis for her sexual discrimination claim to concern a mere textual ambiguity in the drafting of the Complaint, nor a clear misunderstanding regarding its meaning. Rather, Dawson's purported clarification effectively endeavors to rewrite or amend the Complaint through her opposition brief, a procedure not permitted by the Federal Rules. *See* Fed.R.Civ.P. 8(a) and (e); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988); *Marinelli v. Chao,* 222 F.Supp.2d 402, 406–407 (S.D.N.Y.2002). Several considerations support this conclusion.

First, the term "lesbian female" as employed in paragraph 7 of the Complaint is redundant. If Dawson there sought to refer to the basis of her grievance as resting on her sexual status as a woman in the biological sense, rather than more fundamentally on her sexual orientation, there was no need to modify the word "female" with the preceding adjectival use of "lesbian". (Compl.¶ 7.) Second, Dawson ignores the repetition of the exact quote in paragraph 14 of the Complaint, where she alleges: "Dawson was denied promotional opportunities because she was a lesbian who did not conform to gender norms." (Compl.¶ 14.)

Third, the wording of the portion of paragraph 7 that specifies the manner in which Dawson does not conform to gender norms reflects that the primary focus of her charge is on her sexual status as a lesbian rather than as a biological female. In particular, the elaboration asserts that Dawson is a lesbian female who "does not meet stereotyped expectations of femininity" and may be perceived as "more masculine" than a stereotypical woman. However, other than her own self-portrait as not meeting stereotyped impressions and expectations of femininity and her subjective characterization that she "may" be perceived as more masculine than feminine, Dawson presents no competent evidence of comments or actions suggesting that any decision-makers at the Salon had any such perceptions, expectations or demands of her as a woman. Such evidence as Dawson does present, in this Court's assessment, is either vague, gender-neutral, or evinces perceptions grounded on Dawson's sexual orientation rather than her gender.

Moreover, the interpretation of the theory that Dawson urges would imply that the Salon discriminated against all women employees who did not conform to gender norms, a proposition that is not only contradicted by Dawson's own statements and not borne out by any other substantial evidence in the record, but that also conflicts with the thrust of Dawson's claim, which does not assert that Dawson deviated from gender norms as a straight woman, but as a lesbian.

Fourth, throughout the balance of the Complaint, Dawson's point of reference in conveying how she was treated less favorably than other assistants at the Salon—in being denied promotion to stylist and participation in advanced and editorial styling classes—is not to the other co-workers strictly as males and females, but to "similarly situated heterosexuals" who conformed to gender norms. (*See, e.g.,* Compl. ¶¶ 14, 15, 16, 19.) The word "heterosexual" does not connote sex in an existential sense of being biologically male or female, but rather defines a particular individual preference in sexual orientation and affiliations. *See Merriam–Webster's Collegiate Dictionary* 545 (10th ed.1998) ("la: of, relating to, or characterized by a tendency to direct sexual desire toward the opposite sex").

Dawson's belated effort to reform her Complaint by interpretation at this point is similarly undermined or belied by her own numerous direct reiterations and reaffirmations of her focus on discrimination as a lesbian and the meaning of her statement that is unambiguously expressed throughout her deposition. *See Raskin,* 125 F.3d at 63 (rejecting plaintiff's effort to create factual issue by contradicting assertions in prior deposition testimony). Repeatedly and consistently, in her testimony explaining the basis for her sexual discrimination claims, Dawson describes the grounds to be both that she was a lesbian and that she was a "lesbian who did not conform to gender norms." (Dawson Dep., at 185, 383, 395–96, 495–96.) Only tangentially does she allude to being treated disparately as a female in relation to males at the Salon. As to these assertions, as more fully discussed below, Dawson's claim is either inconsistent with other testimony, integrally connected with her chosen sexual status and charges grounded on sexual orientation, or insufficiently supported by the evidence to sustain a reasonable determination of gender discrimination.

Dawson concedes explicitly in her deposition that her sex discrimination claim rests exclusively on the two grounds expressed above, as distinct from disparate treatment on the basis of her biological sex. For example, when asked pointedly whether there was anything else she would add, as other reasons for being discriminated against, to the two separate grounds she had already articulated—her being a lesbian and a lesbian who "looks a certain way"—Dawson responded: "No." (Dawson Dep. at 185–86.) Pressed for elaboration at a later point as to which grounds she contends constituted Bumble's basis for unlawful discrimination, she answered: "Both," again expressly referring only to her being a lesbian and a lesbian who did not conform to gender norms. In the same colloquy, the following exchange, which is already cited above but bears repetition, ensued:

Q. I'm asking you whether it's your view that you were discriminated against simply because you were a lesbian or whether being a lesbian would have been okay, it was being a lesbian combined with not conforming to gender norms that caused a problem?

A. Yes, the latter answer.

. . . .

Q. Is it your view that it's okay to be a gay male at the salon as long as you appear to be like a heterosexual male?

A. Yes.

Q. What if you're a gay male that looks effeminate, is that okay to the salon?

A. Not really.

(*Id.* at 383–84.)

During the one occasion when she was asked to distinguish clearly between sexual orientation and gender reasons as the sexual discrimination basis for her termination, Dawson remarked that it was both "[b]ecause the two are not different." (*Id.* at 395–96.)

Finally, in concluding her testimony, Dawson was asked once more whether she felt that not having been promoted to the razor class was discriminatory on the basis of her sexuality "in that they needed straight men and very feminine looking women." (*Id.* at 495.) She responded:

A. Yeah, that's what I mean by sexuality.

Q. Because of your being a lesbian, that didn't confirm [sic] to gender norms?

A. Correct.

(*Id.* at 495–96.) This answer, in conjunction with all of Dawson's uniform testimo-

ny on this point, reaffirms that the notion of discrimination as she conceives it and advances in this litigation is fundamentally rooted in sexual orientation, and not on sexual stereotyping strictly because of sex in biological terms and unrelated to sexual preference.

The evidence Dawson cites as the manifestation of Bumble's sexual stereotyping is equally conflicting and unpersuasive. Essentially, it consists of two strands: vague, conclusory and unsubstantiated allegations that some people at the Salon, whom she does not identify, did not like the way she dressed, and comments allegedly made to her by Voines at the time she was fired regarding the haircut Dawson had recently obtained, outside of the Salon, at a barber shop. As detailed further below, neither of these examples is sufficiently probative of discrimination by the Salon on any ground, particularly in the context of the Salon's relevant work environment already portrayed above, where certain reasonable commentary about looks may be a necessary and customary aspect of the particular business environment.

The question concerning perceptions at the Salon about her clothing derives from the comment made to Dawson by Formisano to the effect that there was a general consensus at the Salon that the way Dawson dressed—her leather pants and denim jacket—"was a costume." (*Id.* at 199–200.) But Dawson stated that Formisano did not name who in the Salon held those perceptions, nor that the opinion expressed was even his own. (*Id.*) Formisano's observation represented merely an unattributed general comment about how Salon "people" felt. Nothing in this exchange suggests evidence that Formisano was conveying views of Bumble management, or that he himself spoke or could speak on behalf of the Salon on the matter. Although

Dawson took the import of Formisano's comment to mean that she should think about the way she looked and dress differently, she did not understand him to say that she did not dress professionally, and she acknowledged that Formisano "didn't make a comment as to how he thought I should dress." (*Id.* at 201–202.) Most telling and relevant to undermine Dawson's sexual stereotyping claim, while claiming that Formisano's comment upset her, she concedes that she told no one at the Salon about it. (*Id.* at 200.)

No more convincing is the alleged manifestation of sexual stereotyping Dawson sees in the evidence she proffers regarding Voines's comments about her hair. Dawson's own testimony on the subject is self-contradictory. She claims, on the one hand, that when she was discharged by Voines, "my being fired was [because of] my haircut" because it was "too masculine and military." (*Id.* at 290.) At the same time, Dawson asserts that "the whole firing ... wasn't about hair...." (*Id.* at 297.) In fact, she points out that Raymond McLaren himself had given her a "very close" and "very short" mohawk that "was actually a more severe haircut than shaving my head or getting the haircut that I was fired for...." (*Id.* at 294.)

Also inconsistent with Dawson's stereotyping theory and inherently conflicting with her own testimony, is her indication that when she was getting a haircut at the Salon, Voines would come up to her and say in passing: " 'I know you like it like a boy, cut it like a boy.' " (*Id.* at 293.) Asked whether Voines had expressed any problems with those haircuts, Dawson replied: "No ... I think she was just making reference to ... I liked it short." (*Id.*) Indeed, Dawson also asserted that when she expressed interest in a shorter haircut in connection with Gay Pride Week, Voines told her she could shave the sides and the

back: "She gave me permission for that haircut, the one that she fired me for," and she acknowledged that what Voines had expressed unhappiness about was that Dawson's haircut was done outside the Salon. (*Id.* at 284.)

In the face of these palpable self-contradictions, Dawson seeks to minimize and reshift her own attention to the haircut as an issue, contending instead that the real focus of Voines's comments went beyond the haircut and was more broadly about the way Dawson looked, thus injecting another dimension of the gender stereotyping claim into her argument. The Court is not persuaded.

First, accepting as true Dawson's version of the conversation, nothing in her testimony reasonably supports a reading of Voines's remark to suggest that it referred to anything other Dawson's haircut. On two occasions Dawson makes mention of Voines's reference to her haircut, remarking that it was "not acceptable" and would "scare people." The context is clear that Dawson's reference to "the way I looked" specifically expressed, not anything Voines had said, but Dawson's own interpretation of the conversation. (*Id.* at 283, 295–96.) Moreover, Dawson's mention of "the way [I] looked" in each instance related not to any other aspect of her appearance specifically noted by Voines, but only to her haircut. For example, when asked what was her understanding of why Voines felt Dawson would scare people and why she could use Dawson only in New York, Dawson answered: "She told me because of my haircut, because ... people ... wouldn't understand me." (*Id.* at 296.)

Contrary to Dawson's theory, and viewing her testimony in context, insofar as she makes any allusion to an understanding of the actual reason for Voines's concern over Dawson's haircut and look, it was grounded not on gender or sexual stereotyping, but on sexual orientation. Pressed to explain her understanding of the meaning of Voines's comment to the effect that she could use Dawson only in New York, and of Dawson's own interpretation that Voines was referring to the way she looked, Dawson was then asked whether she felt Voines's comment related to Dawson's being a lesbian. (Dawson Dep. at 297.) To this query Dawson responded that although Voines did not come out and say in so many words that that explanation was the real reason, Dawson understood it as part of the reason because of "[t]he way she said it," immediately adding that the firing "was not about my work ... it was about something that had nothing to do with my abilities." (*Id.*)

But even crediting Dawson's version of the comments about her haircut and the way she looked, and assuming that her numerous conflicting statements concerning the very issue could be discounted—an assumption the Court cannot entertain—the Court finds nothing on the record to support a reasonable finding that Voines's remarks sufficiently evidenced sexual stereotyping. In the work environment of the Salon, a remark relating to Dawson's preferred dress style in leather pants and a denim jacket could not reasonably be construed to express a normative judgment conveying deviation from gender stereotypes. Moreover, Voines's haircut comment contains no reference whatever to sex or to societal notions about proper femininity.

In fact, unlike the circumstances that gave rise to the gender discrimination charge in *Price Waterhouse* and other recognized instances of sexual stereotyping, the specific comments and incidents Dawson relies upon as grounds for her claims do not convey any expression directly or even reasonably implicitly remarking on

Dawson's sex. They neither implicate a view of the way in which her employer considered she departed from perceived gender norms, nor do they intimate how she should or should not look or behave in relation to perceptions and expectations of sexual stereotypes. Instead, as to both the costume and the haircut comments, the gender element here is injected by Dawson herself deductively, by conclusions she draws from those remarks and the inferences of discrimination she asks the Court to make and endorse as well. The Court cannot accept Dawson's invitation to speculate. *See Bianchi*, 183 F.Supp.2d at 736–37 (rejecting sexual stereotyping claim because it was based not on direct evidence of gender content in the remarks plaintiff cited as demonstrating discrimination because of sex, but on plaintiff's own perception and a series of inferences the court was called to draw in order to find a Title VII violation in the offensive comments at issue).

An objective and fair reading of the evidence, in light of the totality of the circumstances, suggests that both Formisano's and Voines's remarks appear gender-neutral. Reasonable people could just as well conclude, for example, that Voines could have felt equal concern that a male Salon assistant with a similarly unacceptable haircut would no less "scare people" outside of Manhattan. Neither was there anything in Formisano's statement suggesting that Dawson dressed too much like the stereotypical image of a male, or too little like that of a female. Insofar as reasonable fact-finders could determine that some non-discriminatory reason for Bumble's action is just as plausible or likely as the ground constituting the basis for the alleged adverse employment action, Dawson has not met her burden of proof on this claim. *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir.2001) ("[W]here the bur-

den of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced."); *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994) (same).

The Court concludes that the record before it could not reasonably support a determination that Voines's remarks about Dawson's haircut manifested unlawful sex discrimination and that Dawson has not presented sufficient evidence otherwise to support her sexual stereotyping claim. *See Tavora v. New York Mercantile Exch.*, 101 F.3d 907, 908 (2d Cir.1996) (per curiam) (holding that a company's policies that imposed different restrictions on hair length of male employees from that of females did not violate Title VII, on the rationale that "hair length policies are not within the statutory goal of equal employment ... or ... have only a *de minimis* effect ...." (citations omitted)).

### 3. *Gender*

#### a. *Failure to Promote*

■ Dawson also asserts discrimination on the basis of gender. Specifically, she claims that she was not advanced to the razor class and promoted to hair stylist and was denied opportunities to participate in the Salon's advanced styling and editorial styling classes on account of her being a woman. As evidence, Dawson cites the answer Voines allegedly gave to her inquiry as to why she was not selected to take the advanced classes. According to Dawson, Voines replied: "How many women do you see doing editorial? ... They only want men with accents." (Dawson Dep. at 238.) Dawson asserts that the editorial stylists employed by the Salon were primarily men. (*Id.* at 397.)

Bumble counters that denial of these opportunities do not represent adverse

employment actions and that, in any event, Dawson has not established that she was qualified for promotion and there is no evidence in this case from which a factfinder could reasonably determine that gender discrimination was the reason for the actions Bumble took with respect to Dawson's employment at the Salon.

### (i) *Qualifications*

Dawson asserts that she was just as technically competent and otherwise qualified as other assistants at the Salon who were promoted to stylist and permitted to participate in the advanced seminars. However, other than her own conclusory, subjective opinion that she was no less qualified than other assistants, male or female, selected to take the advanced classes, Dawson offers no competent evidence that her professional abilities were comparable to those of the employees chosen either for the advanced styling classes or for graduation to stylist. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129–30 (2d Cir.1996) (a plaintiff's subjective view of her qualifications and job performance are insufficient to establish a genuine factual dispute that the employer's reasons were pretextual); *see also Thornley v. Penton Publ'g, Inc.,* 104 F.3d 26, 29 (2d Cir.1997) (noting that the requirement that the plaintiff be "qualified" for a particular job refers to the employer's specified criteria for the position and is analyzed in terms of whether the plaintiff shows "satisfactory job performance" at the time of discharge).

The generalized praise and encouragement Dawson alleges having received from Voines, Santiago and other Salon employees is also conclusory and does not specifically address all of the basic standards of technical competence, attitude, interpersonal skills and work ethic the Salon employed to promote assistants. The testimony of both Voines and Santiago rebuts Dawson's assertions that they considered her ready to advance to stylist. Dawson admitted that at the time she was discharged she had not completed mastery of the four haircuts required by the Salon for promotion, (Dawson Dep. at 174–76), and that Santiago told her, as Santiago's testimony confirms, that her failure to progress derived in part from her "carrying old habits" from former experience in hair cutting and styling techniques, (*id.* at 174–76; Santiago Dep. at 28–31).

Dawson also acknowledged that shortly before her termination, during the last stylist rotation she completed at the Salon, Formisano gave her a negative evaluation, and that Nancy Morandi, one of the two stylists to whom she was next assigned, refused to have her as an assistant on the ground that Dawson did not adequately perform her duties, (Dawson Dep. at 277), and that she was told that Salon clients had complained about her, (*id.* at 161). Further, Dawson concedes that she was told by Voines at the time she was discharged that she had missed too many classes and did not bring enough models for the training program and that she seemed unhappy on the job. (Compl.¶ 15, 30.) Dawson testified that she never complained to Voines or anyone else at the Salon that not being selected to take the advanced styling class and not being promoted to stylist represented acts of discrimination against her. (Dawson Dept. at 232, 243–44.)

As against Dawson's generalizations and conclusory opinions, Bumble has produced direct evidence that Voines and Santiago considered Dawson's technical skills below average; that Dawson was not recruiting the proper number or types of models necessary for the education program; that her time and attendance record was poor; that other hair stylists for whom she

worked frequently complained that her performance was inadequate and that her attitude was abrupt and unfriendly; that at least two other stylists refused to work with Dawson because of her inadequate performance and general attitude; that clients complained about her as well; that Dawson was made aware of these deficiencies; and that only between 10 to 15 percent of the Salon's assistants, most of them women, graduate to stylists after two to three years on the job.

On this record, the Court concludes that Dawson cannot establish that she was qualified for the job and employment opportunities she asserts were unlawfully denied her.

### (ii) *Adverse Employment Action*

To qualify as a sufficient element of a Title VII violation, an alleged adverse employment action must materially change the employee's working conditions, and "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Weeks v. New York State Div. of Parole*, 273 F.3d 76, 85 (2d Cir. 2001), *abrogated on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2069–2072, 153 L.Ed.2d 106 (2002), *and recognized by Johnson v. Buffalo Police Dep't*, 46 Fed. Appx. 11, 13 (2d Cir.2002). Such action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). A materially adverse change might also be indicated by a demotion evidenced by a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation. *Weeks*, 273 F.3d at 85. An adverse employment action need not translate into financial consequences. Implicit in these criteria in that an adverse employment action does not necessarily demand a finding of monetary consequences but that other indices unique to a particular situation may produce a change in employment status sufficient to establish a Title VII claim as long as the effects are material under the circumstances of the given case. In fact, this Court has recognized that a material decrease in earning potential may qualify as an adverse employment action. *See, e.g., Davis v. City of New York*, No. 00 Civ. 4309 SAS, 2000 WL 1877045, at *6 (S.D.N.Y. December 27, 2000); *Ramazzotti v. El Al Israel Airlines*, No. 91 Civ. 6543 (KTD), 1994 WL 132275, at *3 (S.D.N.Y. April 14, 1994).

Here, Dawson concedes that no differences in pay or other financial job benefits or changes in the assistant's duties on the Salon's floor were associated with moving incrementally through the various levels of the studio's educational program. Dawson argues, however, that being prevented from participating in training opportunities and from graduating from the educational program so as to become a full stylist diminished her earning potential within the Salon and her marketability outside. Bumble responds that since no material changes in job opportunities or in the type of work performed on the Salon's floor occur when an assistant progresses from one basic class to another or participates in the advanced styling seminars, Dawson suffered no adverse employment action. According to Bumble, the Salon's advanced styling classes are supplemental, involve only a small number of selected assistants and participation in them is not required for promotion to stylist.

The Court finds that these differences present a genuine factual dispute relating to the scope of an adverse employment

action under "indices that might be unique to a particular situation." *Burlington Indus.*, 524 U.S. at 761, 118 S.Ct. 2257 (quoting *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)); *Weeks*, 273 F.3d at 85. It appears certain that the progression through the Salon's educational levels and ultimate advancement to stylist would represent a material alteration of an assistant's working conditions, job status and duties and financial rewards within the Salon. The stylists work on commissions and, within the particular employment hierarchy of the hairdresser's work environment, a reasonable fact-finder could conclude that the stylists enjoy higher job and social status than the salaried assistants who work with them. Less certain on this record is the role of the advanced styling classes in the scheme of the Salon and the hairdressing industry. On the record before it, the Court cannot assess the degree to which participation in the seminars may create a niche for "subtle distinctions" in material terms and conditions of employment unique to the hair styling context. *Rodriguez v. Board of Ed.*, 620 F.2d 362, 364 (2d Cir.1980). Thus, the Court could not rule out definitively the possibility that in some form a denial of opportunities to participate in the Salon's advanced styling classes could produce a material change in a hair assistant's employment status.

### (iii) *Inference of Intentional Discrimination*

This factual dispute, however, does not rescue Dawson's promotion claim based on alleged gender discrimination. First, the Court has already described above the overwhelming evidence demonstrating that Dawson did not satisfy the Salon's criteria for promotion and that her performance both in the educational program and on

the floor were inadequate. No reasonable jury could find otherwise on this record.

Second, the Court finds that even if Dawson's gender discrimination claim survived the *prima facie* case test, Dawson has not met her burden of raising a sufficient inference that the employment actions she suffered occurred by reason of discrimination "because of sex". The statistical evidence Bumble presents, unrefuted by Dawson, argues strongly against a reasonable inference of discrimination in the Salon's employment of assistants in general during Dawson's tenure or of Dawson in particular. According to Voines, nine out of fifteen assistants she selected for the advanced styling class while Dawson worked at the Salon were woman. (Voines Aff. ¶ 32.) Voines further attested that of the 38 assistants hired by the Salon during the 17 months Dawson was employed, only four of them, all of them women, advanced through the entire educational program and were promoted to stylist. (Voines Reply Aff. ¶ 3.)

Third, insofar as Voines's alleged response to Dawson's request may have reflected gender content, the record does not sustain that it represented more than an instance of an isolated or stray comment. *See Ngwu v. Salvation Army*, No. 96 Civ. 0058 (DAB), 1999 WL 2873, at *5 (S.D.N.Y. January 4, 1999); *O'Connor v. Viacom Inc.*, No. 93 Civ. 2399 (LMM), 1996 WL 194299, at *5 (S.D.N.Y. April 23, 1996), *aff'd*, 104 F.3d 356, 1996 WL 722620 (2d Cir.1996).

On this record, the Court concludes that no reasonable jury could find that Bumble's denial of promotion and other advancement opportunities to Dawson were motivated by intentional discrimination because she was a woman,[6] or that the rea-

---

**6.** Based on the evidence summarized here, this conclusion would pertain as well to Daw-

sons Bumble proffered for its employment actions against Dawson were false and a pretext for unlawful gender discrimination.

### b. *Wrongful Discharge*

#### (i) *Bumble's Proffered Reasons*

■ Based on the same evidence regarding her inadequate performance on the job, Dawson's termination charge fares no better than her promotion claim. Dawson's description of the circumstances relating to her discharge by Voines on July 15, 2000 present no evidence that would support a reasonable inference that her termination was grounded on intentional gender discrimination. In fact, the entire thrust of Dawson's claim is that the reasons Voines articulated for firing her had to do with Dawson's sexual orientation as a lesbian, or as a lesbian who does not conform with gender norms. The Court has already ruled that even if a gender stereotyping theory were recognized under Title VII, Dawson has not sufficiently alleged such a claim, nor offered substantial evidence to sustain her burden of persuasion.

■ In any event, examining the record as a whole in light of the legitimate reasons Bumble proffered for dismissing Dawson and all the supporting evidence of non-discrimination already summarized above, and assuming Dawson could establish the elements of a *prima facie* case of discriminatory discharge, no reasonable jury could conclude that the grounds the Salon articulated are false and merely a pretext for discrimination on the basis of gender, or indeed on any other unlawful ground.

Other relevant evidence of non-discrimination on the record here includes the uniquely diverse, non-conventional context,

described above, that prevailed at the Salon. Dawson was both hired and fired, seventeen months later, by Voines, an acknowledged transsexual. *See Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 560 (2d Cir.1997) (noting that it is difficult to infer a motivation of intentional discrimination when the person who hires the plaintiff was the same who fired her). During her employment at the Salon, Dawson made no secret of her sexual orientation, and admitted that other visibly lesbian, bisexual and transsexual women worked there. Among the nonconformists, Dawson specifically mentioned one named Randy who had "been there for a very long time," and who was noted for being "very hip-hop", wearing baggy pants and having "bladed" hair. (Dawson Dep. at 377–78.)

#### (ii) *Asserted Pretext*

■ In the face of this record, Dawson insists that Bumble's reasons for her termination were false and a pretext for unlawful discrimination because of Voines's alleged references, at the time she fired Dawson, to Dawson's hair, which Dawson perceived to extend to her overall appearance and nonconformance to gender norms. In rejecting Dawson's sexual stereotyping claim, the Court has already discussed the inherent contradictions in Dawson's testimony on this point. The analysis is equally applicable here to support a conclusion that no reasonable factfinder could infer sexual discrimination in any form in the Salon's decision to discharge Dawson.

Dawson also cites as evidence of pretext certain comments attributed by Cunningham during a conversation among herself, Santiago, and the McLarens that occurred

son's claims of discrimination based on sexual orientation and sexual stereotyping, assuming they were recognized as legally cognizable

claims and satisfied all the elements of a *prima facie* case.

over drinks at a bar after work approximately one month before Dawson was fired. On that occasion, the McLarens allegedly referred to Dawson as a "dyke," commented on her "dyke attitude" and allegedly said they were going to fire her. Dawson was not present during this event; she learned about it from Cunningham after she was fired.

■ Cunningham's allegations were denied by Santiago and Raymond McLaren. Cunningham's hearsay statement would not suffice to raise an issue of fact concerning Dawson's termination. Dawson has produced no admissible evidence, other than her own speculation and conclusory statements, and those of Cunningham, that the McLarens played any role in Dawson's discharge. In fact, Dawson admits that she was never in any class conducted by either of the McLarens, never worked as an assistant for either of them, and thus was never in a supervisory relationship under them. (*Id.* at 422.) Despite their suspicions and speculation on the subject, Dawson and Cunningham both testified that they did not know who made the decision to dismiss Dawson. (Dawson Dep. at 395; Cunningham Dep. at 81.) The only admissible evidence on the record regarding this point is Voines's declaration that she did not consult the McLarens prior to discharging Dawson and that the McLarens had no authority to fire anyone. (Voines Reply Decl. ¶ 12; Voines Dep. at 117, 130.) Allegedly discriminatory remarks by non-decisionmakers, or by officers with general authority to hire and fire but who played no role in the plaintiff's dismissal, are insufficient to create an issue of disputed fact for trial. *See Mauter v. Hardy Corp.,* 825 F.2d 1554, 1558 (11th Cir.1987); *Legendre v. Chase Manhattan Bank,* No. 94 Civ. 2911 (JES), 1996 WL 514874, at *6 (S.D.N.Y. September 10, 1996); *Corcoran v. GAB Bus. Servs., Inc.,* 723 F.Supp. 966, 968–69 (S.D.N.Y.1989).

D. *SEXUAL HARASSMENT*

Dawson's sexual harassment claim is grounded on the specific remarks by the McLarens, Formisano and Uzunoglu recited above. Dawson regards those incidents as sufficiently severe or pervasive to satisfy the Title VII standard of a hostile or abusive working environment. The Court finds that the evidence is insufficient to support a reasonable determination in favor of Dawson's claim.

■ As a threshold matter, a sexual harassment hostile environment claim, like all other actions under Title VII, must establish differential treatment of the employee as a member of the protected class. Specifically, the employee must prove that she suffered " 'discriminat[ion] ... because of ... sex' in the 'terms' or 'conditions' of employment." *Oncale,* 523 U.S. at 79–80, 118 S.Ct. 998 (quoting Title VII).

In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court enunciated the standard governing determinations of sexual harassment claims. The Court declared that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). This doctrine was further elaborated in *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). There, the Supreme Court provided additional guidance, holding that in a Title VII hostile environment claim, the plaintiff must establish that (1) the "workplace is permeated with 'discriminatory intimidation, ridicule and insult' " that is so " 'severe or pervasive' " as to create an "objectively hostile or abusive work envi-

ronment", and (2) the plaintiff in fact "subjectively perceive[d] the environment to be abusive." *Id.* at 21–22, 114 S.Ct. 367 (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. 2399).

To aid the determination of whether particular workplace misconduct is sufficiently "severe or pervasive," the *Harris* Court articulated a list of several non-exclusive considerations—whether, in the light of all the circumstances, the discriminatory behavior: (1) was sufficiently frequent, or (2) severe; (3) was physically threatening or humiliating or merely an offensive comment; (4) unreasonably interfered with the victim's work; and (5) caused psychological harm. *See id.* at 23, 114 S.Ct. 367. By way of contrast, the Court has instructed that " 'simple teasing' . . . offhand comments, and isolated incidents (unless extremely serious)" will not suffice to satisfy this standard. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale,* 523 U.S. at 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)); *see Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271–72, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (upholding the district court's granting of summary judgment dismissing a sexual harassment claim based on a single allegedly offensive comment under circumstances where the court found no reasonable person could have believed the incident involved violated the Title VII standard); *see also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767–68 (2d Cir.1998); *Carrero v. NYC Hsng. Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989); *cf. Richardson,* 180 F.3d at 436 (adopting similar standards with respect to racial harassment).

▆▆▆▆ The Second Circuit has enunciated other pertinent rules that further prescribe the proper scope of the frequency and severity for alleged discriminatory conduct that must be shown to become actionable under a hostile work environment theory. "Isolated incidents or episodic conduct will not support a hostile work environment claim." *Richardson,* 180 F.3d at 437. If an alleged act of harassment is merely offensive, so that it does not unreasonably interfere with the employee's job performance, and is not " 'sufficiently continuous and concerted' to be considered pervasive, it is beyond the purview of the discrimination laws." *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999) (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). Nonetheless, while minor incidents do not merit relief under Title VII, "even a single episode of harassment, *if severe enough,* can establish a hostile work environment." *Torres v. Pisano,* 116 F.3d 625, 631 n. 4 (2d Cir.1997) (emphasis added). Moreover, the Circuit Court has noted that the applicable standards "caution[ ] to consider the totality of the circumstances . . . and to evaluate the 'quantity, frequency, and severity' of the incidents. . . . [T]he factors must be considered 'cumulatively' so that we may 'obtain a realistic view of the work environment.' " *Richardson,* 180 F.3d at 437 (citations omitted).

▆▆▆▆ The Court finds the evidence here insufficient to demonstrate that, in light of the totality of the circumstances and taking a realistic view of the Salon's work environment, the incidents Dawson charges as sexual harassment constitute violations of Title VII. First, the Court has already ruled that Dawson has not established that the alleged discrimination she suffered arose "because of sex" rather than sexual orientation. In fact, Dawson's sexual harassment action appears to be grounded entirely on sexual orientation, as all of the incidents she described as evidence supporting her claim relate to her

orientation rather than to biological sex, and her testimony indicates that she so understood the incidents.

Second, even if the conduct in question related to Dawson's status as a member of a protected class, the Court is not persuaded that a reasonable jury could find that objectively the incidents Dawson complains of were so severe or pervasive to create a hostile or abusive work environment actionable under Title VII, or that Dawson subjectively so perceived them.

### 1. *Formisano's Comment*

Dawson contends that Formisano's remark that "it was felt ... that the way [Dawson] dressed was a costume" constituted sexual harassment. (Dawson Dep. at 198.) She testified in her deposition that beyond this statement Formisano made no other comment; that he gave no specifics concerning who at the Salon had such a perception; that she did not understand Formisano himself to convey that he shared the view; that he did not express an opinion as to how she should dress; and that she told no one at the Salon about Formisano's comment. (*Id.* 199–202.) Based on these vague statements, Dawson deduced that Formisano's observations must have conveyed a message that the leather pants and denim jacket she wore deviated somehow from clothing typically worn by stereotypical women and that the Salon management disapproved of her style of dressing. In other words, the sexual harassment Dawson alleges rests more on what she extrapolated from Formisano's remark than from what he actually said or could reasonably have been understood to say. A Title VII harassment claim cannot rest on such unsubstantiated surmises and subjective conclusions. *See, e.g., Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 206 (2d Cir.1995); *Ghose v. Century*

*21, Inc.,* 108 F.Supp.2d 373, 378 (S.D.N.Y. 2000), *aff'd,* 12 Fed.Appx. 52 (2d Cir.2001).

Moreover, the Court finds that, objectively, Formisano's comment, standing alone and unrelated to any other offending conduct on his part, would not be regarded by a reasonable fact-finder as sufficiently severe or pervasive to alter the conditions of Dawson's employment. *See Breeden,* 532 U.S. at 272, 121 S.Ct. 1508. Nor does the evidence indicate that subjectively Dawson held a good faith belief that Formisano's comment was so severely offensive that it unreasonably interfered with her work in any way. Though she claims the remark upset her, she discussed it with no one at the Salon. And, in another instance of how the subjectivities waver and the lines of sensibilities here blur, while Dawson claims that she was so offended and upset by Formisano's vague, unattributed remark about her clothing style that she considered it an act of unlawful sexual harassment, oddly she recounted how on two other separate unprovoked encounters with Formisano, he called her "bitch" and "cunt", but that she did not regard either of those incidents as discriminatory behavior towards her. (Dawson Dep. at 205, 208, 367.) Finally, the Court finds that no reasonable jury could conclude that, in the social context of the Salon, Formisano's comment about Dawson's wearing the leather pants and denim jacket she describes as her regular manner of dress, could be reasonably construed as severely offensive.

### 2. *The McLarens' Comments*

Dawson alleges that repeated instances in which Raymond and Howard McLaren called her "Donald" rather than "Dawn" constituted sexual harassment. As an initial matter, with regard to these alleged comments, Dawson asserted unequivocally that she understood the McLarens to refer solely to her being a lesbian, and hence her harassment claim in this regard would

rest solely upon a sexual orientation theory. (Dawson Dep. at 249–50.)

As in the case regarding Formisano's alleged comment, contradictions in Dawson's testimony, as well as inherent inconsistency in her basis for recovery, detract from evidence that Dawson believed in good faith that the McLarens' comments were sufficiently severe, pervasive or threatening to constitute actionable sexual harassment. Here, too, the context of the Salon as described by Dawson herself, and the totality of the circumstances, provide essential backdrop. Dawson testified that it was common at the Salon for staff to be referred to by nicknames, their own or those that there attached to them. (*Id.* at 74.)[7] In "the dynamic of that kind of setting," Dawson acknowledged that the McLarens' behavior represented "life stuff that you take from other people ... because ... nobody was excluded from that", and that she would not characterize the behavior as "mean". (*Id.* at 100–101.) Thus, by her own admission, Dawson subjectively perceived the McLarens' comments as nothing more than "the ordinary tribulations of the workplace", which, though encompassing "sporadic use of abusive language, gender-related jokes, and occasional teasing," does not give rise to unlawful discrimination under Title VII. *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).

Dawson also admitted that there were times when she referred to herself at the Salon as a "dyke" and that she once gave Raymond McLaren a T-shirt which had "reference to something lesbian on it." (Dawson Dep. at 389.) She did so because "lesbian jokes were brought up," and she

wanted "to send a message [sic] I could laugh at myself" and say to the McLarens that "it's okay to joke around." (*Id.* at 390–91.) In fact, Dawson described that she once, as a joke in the presence of Voines, asked a male assistant at the Salon to accompany her to a sadomasochist bar and be her "boy." (*Id.* at 392–93.)

Dawson asserts that she understood the McLarens' calling her Donald as a reference to her sexual orientation: "That I was a boy. That I wanted to be a boy." (*Id.* at 249.) She acknowledged that she liked her hair short like a boy's, that the way she dressed presented the appearance of a boy and that she frequently was mistaken for a boy. (*Id.* at 385–86.) Asked whether she liked to be mistaken for a boy, she stated that it did not bother her and that she felt no pressure from being so mistaken. (*Id.* at 386.)

By contrast, Dawson also asserts that the first time Raymond McLaren called her "Donald", it bothered her enough that she reported the incident to Voines shortly after it occurred. The only other time she complained to Voines about the matter was months later, toward the end of her employment. (*Id.* at 258.) Though she says that the McLarens' calling her Donald became habitual, she also concedes that she never said to either of them that she considered their comments upsetting and that she never discussed the matter with anyone else at the Salon. (*Id.* at 254, 258, 259, 264.) She also stated that she has no specific recollection of anyone else hearing the McLarens calling her Donald.[8] (*Id.* at 259.) And while she states on the one hand that Raymond McLaren would call her Donald whenever an occasion arose

---

**7.** Referring to Cunningham, Dawson recounted that, though her real name was Monica, "at the time they called her Shawn," and explained that "[i]n hairdressing ... they change your name, you have no last name ... it's very unofficial like that...." (*Id.*) She

added that later on Cunningham wanted to be called by her real name and "they changed it for her...." (*Id.*)

**8.** In her opposition papers, Dawson purports to alter her deposition testimony on this

"because it was funny," that Howard McLaren referred to her as Donald when he wanted to make a joke, and that "it became a joke between [the McLarens]", Dawson also asserts that she felt they did not mean the practice as a joke and that she did not take it as humor. (*Id.* at 258, 261.)

■■■ The Supreme Court has cautioned that Title VII is not intended as a " 'general civility code.' " *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (quoting *Oncale,* 523 U.S. at 80, 118 S.Ct. 998). In this vein, Title VII doctrine instructs that employee conduct founded on "the ordinary tribulations of the workplace, such as the use of abusive language, gender-related jokes, and occasional teasing" is not actionable under the discrimination laws. *Id.*

On the record before it, the Court concludes that a reasonable trier of fact could not determine that Dawson's being called "Donald" was objectively pervasive, severe or threatening enough to violate Title VII. Dawson adduces no evidence to compel a conclusion that the McLarens' "Donald" comments comprised anything more than the kind of workplace teasing Dawson herself conceded was part of inevitable "life stuff" people regularly take from one another "because ... nobody was excluded from that." (Dawson Dep. at 100–101.) Nothing on this record is sufficiently persuasive to support a reasonable conclusion that Dawson in good faith was offended by the McLarens' conduct or that the conduct in any way altered the conditions of her employment or unreasonably interfered with the performance of her work. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Brennan,* 192 F.3d at 318. To the contrary, Dawson expressly stated that the alleged harassment she complains of did

not affect her job performance or effectiveness in any way, and that, in fact, "[i]t made [her] work harder." (Dawson Dep. at 365–66.)

### 3. *The Uzunoglu Comments*

■■■ Dawson's harassment claim relating to Uzunoglu's two comments—that what she needed was sex with a man and that she and Voines should switch body parts—fare no better. The Court finds these harassment charges deficient as a matter of law. There is no dispute that Uzunoglu's remarks were crude and offensive. Even so, under the circumstances here, they were not sufficiently pervasive or severe to establish a Title VII harassment claim. As the Supreme Court has noted, " 'mere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399); *see also Faragher,* 524 U.S. at 788, 118 S.Ct. 2275; *Brennan,* 192 F.3d at 318; *Pisano,* 116 F.3d at 630–31.

Dawson asserts that, though Uzunoglu's first remark was addressed to her directly, she did not report the incident to Voines, and that she learned of the second one from Voines. She acknowledges that Voines took immediate action in firing Uzunoglu, though later rehired him when he pleaded for his job back, and that Dawson accepted Uzunoglu's reinstatement because she knew Uzunoglu's opinion was "limited and isolated." (Dawson Dep. at 273.) She did not discuss the matter further with anyone at the Salon, seeing no need to do so, and simply dropped it, adding that she had the ability to "go home and do that." (*Id.* at 274.)

point, alleging that the McLarens repeatedly referred to her as Donald in front of clients and co-workers and that she consistently corrected them. The Court has noted above that

such after-the-fact modification or amplification of deposition testimony must be disregarded. *See Raskin,* 125 F.3d at 63.

As none of the incidents of harassment Dawson asserts is sufficient to constitute a violation of the discrimination laws standing alone, neither do they give rise to actionable sexual harassment when viewed cumulatively. Accordingly, the Court concludes that Bumble is entitled to summary judgment on Dawson's sexual harassment claim.

### III. CONCLUSION AND AMENDED ORDER

For the reasons discussed above it is hereby

**ORDERED** that the Court's Orders dated January 30, 2003 and February 14, 2003 are amended to incorporate the discussion set forth herein; and it is finally

**ORDERED** that defendant Bumble's motion for summary judgment is GRANTED.

**SO ORDERED.**